# FW/PBS, INC., DBA PARIS ADULT BOOKSTORE II, ET AL. *v.* CITY OF DALLAS ET AL.

No. 87–2012.   Argued October 4, 1989—Decided January 9, 1990*

---

*Together with No. 87–2051, *M. J. R., Inc., et al.* v. *City of Dallas*, and No. 88–49, *Berry et al.* v. *City of Dallas et al.*, also on certiorari to the same court.

218

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and IV, in which REHNQUIST, C. J., and WHITE, STEVENS, SCALIA, and KENNEDY, JJ., joined, the opinion of the Court with respect to Part III, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Part II, in which STEVENS and KENNEDY, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 238. WHITE, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., joined, *post*, p. 244. STEVENS, J., *post*, p. 249, and SCALIA, J., *post*, p. 250, filed opinions concurring in part and dissenting in part.

*John H. Weston* argued the cause for petitioners in all cases. With him on the briefs for petitioners in No. 87–2051 were *G. Randall Garrou, Cathy E. Crosson,* and *Richard L. Wilson. Arthur M. Schwartz* filed briefs for petitioners in No. 87–2012. *Frank P. Hernandez* filed a brief for petitioners in No. 88–49.

*Analeslie Muncy* argued the cause for respondents in all cases. With her on the brief were *Kenneth C. Dippel* and *Thomas P. Brandt.*†

---

†Briefs of *amici curiae* urging reversal were filed for the American Booksellers Association, Inc., et al. by *Michael A. Bamberger;* and for PHE, Inc., by *Bruce J. Ennis, Jr.,* and *Mark D. Schneider.*

Briefs of *amici curiae* urging affirmance were filed for the American Family Association, Inc., by *Peggy M. Coleman;* for the Children's Legal Foundation by *Alan E. Sears;* for the National Institute of Municipal Law Officers

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, and an opinion with respect to Part II, in which JUSTICE STEVENS and JUSTICE KENNEDY join.

These cases call upon us to decide whether a licensing scheme in a comprehensive city ordinance regulating sexually oriented businesses is a prior restraint that fails to provide adequate procedural safeguards as required by *Freedman* v. *Maryland*, 380 U. S. 51 (1965). We must also decide whether any petitioner has standing to address the ordinance's civil disability provisions, whether the city has sufficiently justified its requirement that motels renting rooms for fewer than 10 hours be covered by the ordinance, and whether the ordinance impermissibly infringes on the right to freedom of association. As this litigation comes to us, no issue is presented with respect to whether the books, videos, materials, or entertainment available through sexually oriented businesses are obscene pornographic materials.

## I

On June 18, 1986, the city council of the city of Dallas unanimously adopted Ordinance No. 19196 regulating sexually oriented businesses, which was aimed at eradicating the secondary effects of crime and urban blight. The ordinance, as amended, defines a "sexually oriented business" as "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center." Dallas City Code, ch. 41A, Sexually Oriented Businesses § 41A–2(19) (1986). The ordinance regulates sexually oriented businesses through a scheme incorporating zoning, li-

by *William I. Thornton, Jr., Frank B. Gummey III*, and *William H. Taube;* and for the U. S. Conference of Mayors et al. by *Benna Ruth Solomon* and *Peter Buscemi.*

*Bruce A. Taylor* filed a brief for Citizens for Decency Through Law, Inc., as *amicus curiae.*

censing, and inspections. The ordinance also includes a civil disability provision, which prohibits individuals convicted of certain crimes from obtaining a license to operate a sexually oriented business for a specified period of years.

Three separate suits were filed challenging the ordinance on numerous grounds and seeking preliminary and permanent injunctive relief as well as declaratory relief. Suits were brought by the following groups of individuals and businesses: those involved in selling, exhibiting, or distributing publications or video or motion picture films; adult cabarets or establishments providing live nude dancing or films, motion pictures, videocassettes, slides, or other photographic reproductions depicting sexual activities and anatomy specified in the ordinance; and adult motel owners. Following expedited discovery, petitioners' constitutional claims were resolved through cross-motions for summary judgment. After a hearing, the District Court upheld the bulk of the ordinance, striking only four subsections. See *Dumas* v. *Dallas*, 648 F. Supp. 1061 (ND Tex. 1986). The District Court struck two subsections, §§ 41A–5(a)(8) and 41A–5(c), on the ground that they vested overbroad discretion in the chief of police, contrary to our holding in *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 150–151 (1969). See 648 F. Supp., at 1072–1073. The District Court also struck the provision that imposed a civil disability merely on the basis of an indictment or information, reasoning that there were less restrictive alternatives to achieve the city's goals. See *id.*, at 1075 (citing *United States* v. *O'Brien*, 391 U. S. 367 (1968)). Finally, the District Court held that five enumerated crimes from the list of those creating civil disability were unconstitutional because they were not sufficiently related to the purpose of the ordinance. See 648 F. Supp., at 1074 (striking bribery, robbery, kidnaping, organized criminal activity, and violations of controlled substances Acts). The city of Dallas subsequently

amended the ordinance in conformity with the District Court's judgment.

The Court of Appeals for the Fifth Circuit affirmed. 837 F. 2d 1298 (1988). Viewing the ordinance as a content-neutral time, place, and manner regulation under *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), the Court of Appeals upheld the ordinance against petitioners' facial attack on the ground that it is "'designed to serve a substantial government interest'" and allowed for "'reasonable alternative avenues of communication.'" 837 F. 2d, at 1303 (quoting *Renton*, *supra*, at 47). The Court of Appeals further concluded that the licensing scheme's failure to provide the procedural safeguards set forth in *Freedman* v. *Maryland*, *supra*, withstood constitutional challenge, because such procedures are less important when regulating "the conduct of an ongoing commercial enterprise." 837 F. 2d, at 1303.

Additionally, the Court of Appeals upheld the provision of the ordinance providing that motel owners renting rooms for fewer than 10 hours were "adult motel owners" and, as such, were required to obtain a license under the ordinance. See §§ 41A–2(4), 41A–18. The motel owners attacked the provision on the ground that the city had made no finding that adult motels engendered the evils the city was attempting to redress. The Court of Appeals concluded that the 10-hour limitation was based on the reasonable supposition that short rental periods facilitate prostitution, one of the secondary effects the city was attempting to remedy. See 837 F. 2d, at 1304.

Finally, the Court of Appeals upheld the civil disability provisions, as modified by the District Court, on the ground that the relationship between "the offense and the evil to be regulated is direct and substantial." *Id.*, at 1305.

We granted petitioners' application for a stay of the mandate except for the holding that the provisions of the ordinance regulating the location of sexually oriented businesses do not violate the Federal Constitution, 485 U. S.

1042 (1988), and granted certiorari, 489 U. S. 1051 (1989). We now reverse in part and affirm in part.

## II

We granted certiorari on the issue whether the licensing scheme is an unconstitutional prior restraint that fails to provide adequate procedural safeguards as required by *Freedman* v. *Maryland,* 380 U. S. 51 (1965). Petitioners involved in the adult entertainment industry and adult cabarets argue that the licensing scheme fails to set a time limit within which the licensing authority must issue a license and, therefore, creates the likelihood of arbitrary denials and the concomitant suppression of speech. Because we conclude that the city's licensing scheme lacks adequate procedural safeguards, we do not reach the issue decided by the Court of Appeals whether the ordinance is properly viewed as a content-neutral time, place, and manner restriction aimed at secondary effects arising out of the sexually oriented businesses. Cf. *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 562 (1975).

## A

We note at the outset that petitioners raise a facial challenge to the licensing scheme. Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad. See *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 798, and n. 15 (1984). In *Freedman,* we held that the failure to place limitations on the time within which a censorship board decisionmaker must make a determination of obscenity is a species of unbridled discretion. See *Freedman, supra,* at 56–57 (failure to confine time within which censor must make decision "contains the same vice as a statute delegating excessive administrative discretion"). Thus, where a scheme creates a "[r]isk of delay," 380 U. S., at 55,

such that "every application of the statute create[s] an impermissible risk of suppression of ideas," *Taxpayers for Vincent, supra,* at 798, n. 15, we have permitted parties to bring facial challenges.

The businesses regulated by the city's licensing scheme include adult arcades (defined as places in which motion pictures are shown to five or fewer individuals at a time, see § 41A–2(1)), adult bookstores or adult video stores, adult cabarets, adult motels, adult motion picture theaters, adult theaters, escort agencies, nude model studios, and sexual encounter centers, §§ 41A–2(19) and 41A–3. Although the ordinance applies to some businesses that apparently are not protected by the First Amendment, *e. g.,* escort agencies and sexual encounter centers, it largely targets businesses purveying sexually explicit speech which the city concedes for purposes of these cases are protected by the First Amendment. Cf. *Smith* v. *California,* 361 U. S. 147, 150 (1959) (bookstores); *Southeastern Promotions, Ltd.* v. *Conrad, supra* (live theater performances); *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976) (motion picture theaters); *Schad* v. *Mount Ephraim,* 452 U. S. 61 (1981) (nude dancing). As JUSTICE SCALIA acknowledges, *post,* at 262, the city does not argue that the businesses targeted are engaged in purveying obscenity which is unprotected by the First Amendment. See Brief for Respondents 19, 20, and n. 8 ("[T]he city is not arguing that the ordinance does not raise First Amendment concerns . . . . [T]he right to sell this material is a constitutionally protected right . . ."). See also *Miller* v. *California,* 413 U. S. 15, 23–24 (1973). Nor does the city rely upon *Ginzburg* v. *United States,* 383 U. S. 463 (1966), or contend that those businesses governed by the ordinance are engaged in pandering. It is this Court's practice to decline to review those issues neither pressed nor passed upon below. See *Youakim* v. *Miller,* 425 U. S. 231, 234 (1976) *(per curiam).*

The city asserted at oral argument that it requires every business—without regard to whether it engages in First Amendment-protected speech—to obtain a certificate of occupancy when it moves into a new location or the use of the structure changes. Tr. of Oral Arg. 49; see also App. 42, Dallas City Code § 51–1.104 (1988) (certificate of occupancy required where there is new construction or before occupancy if there is a change in use). Under the challenged ordinance, however, inspections are required for sexually oriented businesses whether or not the business has moved into a new structure and whether or not the use of the structure has changed. Therefore, even assuming the correctness of the city's representation of its "general" inspection scheme, the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses. For example, inspections are required whenever ownership of a sexually oriented business changes, and when the business applies for the annual renewal of its permit. We, therefore, hold, as a threshold matter, that petitioners may raise a facial challenge to the licensing scheme, and that as the suit comes to us, the businesses challenging the scheme have a valid First Amendment interest.

## B

While "[p]rior restraints are not unconstitutional *per se* . . . [a]ny system of prior restraint . . . comes to this Court bearing a heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 558. See, *e. g., Lovell* v. *Griffin,* 303 U. S. 444, 451–452 (1938); *Cantwell* v. *Connecticut,* 310 U. S. 296, 306–307 (1940); *Cox* v. *New Hampshire,* 312 U. S. 569, 574–575 (1941); *Shuttlesworth* v. *Birmingham,* 394 U. S., at 150–151. Our cases addressing prior restraints have identified two evils that will not be tolerated in such schemes. First, a scheme that places "unbridled discretion in the hands of a government official or agency constitutes a prior restraint

and may result in censorship." *Lakewood* v. *Plain Dealer Publishing Co.*, 486 U. S. 750, 757 (1988). See *Saia* v. *New York*, 334 U. S. 558 (1948); *Niemotko* v. *Maryland*, 340 U. S. 268 (1951); *Kunz* v. *New York*, 340 U. S. 290 (1951); *Staub* v. *City of Baxley*, 355 U. S. 313 (1958); *Freedman* v. *Maryland*, 380 U. S. 51 (1965); *Cox* v. *Louisiana*, 379 U. S. 536 (1965); *Shuttlesworth* v. *Birmingham, supra; Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984). "'It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'" *Shuttlesworth, supra*, at 151 (quoting *Staub, supra*, at 322).

Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible. *Freedman, supra*, at 59; *Vance* v. *Universal Amusement Co.*, 445 U. S. 308, 316 (1980) (striking statute on ground that it restrained speech for an "indefinite duration"). In *Freedman*, we addressed a motion picture censorship system that failed to provide for adequate procedural safeguards to ensure against unlimited suppression of constitutionally protected speech. 380 U. S., at 57. Like a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license. In *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988), this Court held that a licensing scheme failing to provide for definite limitations on the time within which the licensor must issue the license was constitutionally unsound, because the "delay compel[led] the speaker's silence." *Id.*, at 802. The failure to confine the time within which the licensor must make a decision "contains the same vice as a statute delegat-

ing excessive administrative discretion," *Freedman, supra,* at 56–57. Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.

Although the ordinance states that the "chief of police shall approve the issuance of a license by the assessor and collector of taxes to an applicant within 30 days after receipt of an application," the license may not issue if the "premises to be used for the sexually oriented business have not been approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances." § 41A–5(a)(6). Moreover, the ordinance does not set a time limit within which the inspections must occur. The ordinance provides no means by which an applicant may ensure that the business is inspected within the 30-day time period within which the license is purportedly to be issued if approved. The city asserted at oral argument that when applicants apply for licenses, they are given the telephone numbers of the various inspection agencies so that they may contact them. Tr. of Oral Arg. 48. That measure, obviously, does not place any limits on the time within which the city will inspect the business and thereby make the business eligible for the sexually oriented business license. Thus, the city's regulatory scheme allows indefinite postponement of the issuance of a license.

In *Freedman,* we determined that the following three procedural safeguards were necessary to ensure expeditious decisionmaking by the motion picture censorship board: (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *Freedman, supra,* at 58–60.

Although we struck the licensing provision in *Riley* v. *National Federation of Blind of N. C., Inc., supra,* on the ground that it did not provide adequate procedural safeguards, we did not address the proper scope of procedural safeguards with respect to a licensing scheme. Because the licensing scheme at issue in these cases does not present the grave "dangers of a censorship system," *Freedman, supra,* at 58, we conclude that the full procedural protections set forth in *Freedman* are not required.

The core policy underlying *Freedman* is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied. See *Freedman, supra,* at 51. See also *Shuttlesworth, supra,* at 155, n. 4 (content-neutral time, place, and manner regulation must provide for "expeditious judicial review"); *National Socialist Party of America* v. *Skokie,* 432 U. S. 43 (1977).

The Court in *Freedman* also required the censor to go to court and to bear the burden in court of justifying the denial.

> "Without these safeguards, it may prove too burdensome to seek review of the censor's determination. Particularly in the case of motion pictures, it may take very little to deter exhibition in a given locality. The exhibitor's stake in any one picture may be insufficient to warrant a protracted and onerous course of litigation. The distributor, on the other hand, may be equally unwilling to accept the burdens and delays of litigation in a particular area when, without such difficulties, he can freely exhibit his film in most of the rest of the country . . . ." 380 U. S., at 59.

Moreover, a censorship system creates special concerns for the protection of speech, because "the risks of freewheeling censorship are formidable." *Southeastern Promotions*, 420 U. S., at 559.

As discussed *supra*, the Dallas scheme does not provide for an effective limitation on the time within which the licensor's decision must be made. It also fails to provide an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial. We therefore hold that the failure to provide these essential safeguards renders the ordinance's licensing requirement unconstitutional insofar as it is enforced against those businesses engaged in First Amendment activity, as determined by the court on remand.

The Court also required in *Freedman* that the censor bear the burden of going to court in order to suppress the speech and the burden of proof once in court. The licensing scheme we examine today is significantly different from the censorship scheme examined in *Freedman*. In *Freedman*, the censor engaged in direct censorship of particular expressive material. Under our First Amendment jurisprudence, such regulation of speech is presumptively invalid and, therefore, the censor in *Freedman* was required to carry the burden of going to court if the speech was to be suppressed and of justifying its decision once in court. Under the Dallas ordinance, the city does not exercise discretion by passing judgment on the content of any protected speech. Rather, the city reviews the general qualifications of each license applicant, a ministerial action that is not presumptively invalid. The Court in *Freedman* also placed the burdens on the censor, because otherwise the motion picture distributor was likely to be deterred from challenging the decision to suppress the speech and, therefore, the censor's decision to suppress was tantamount to complete suppression of the speech. The license applicants under the Dallas scheme have much more at stake than did the motion picture distributor considered in *Freedman*, where only one film was censored. Because the

license is the key to the applicant's obtaining and maintaining a business, there is every incentive for the applicant to pursue a license denial through court. Because of these differences, we conclude that the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court. Limitation on the time within which the licensor must issue the license as well as the availability of prompt judicial review satisfy the "principle that the freedoms of expression must be ringed about with adequate bulwarks." *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 66 (1963).

Finally, we note that § 5 of Ordinance No. 19196 summarily states that "[t]he terms and provisions of this ordinance are severable, and are governed by Section 1–4 of CHAPTER 1 of the Dallas City Code, as amended." We therefore remand to the Court of Appeals for further determination whether and to what extent the licensing scheme is severable. Cf. *Lakewood* v. *Plain Dealer Publishing Co.*, 486 U. S., at 772 (remanding for determination of severability).

## III

We do not reach the merits of the adult entertainment and adult cabaret petitioners' challenges to the civil disability provision, § 41A–5(a)(10), and the provision disabling individuals residing with those whose licenses have been denied or revoked, § 41A–5(a)(5), because petitioners have failed to show they have standing to challenge them. See Brief for Petitioners in No. 87–2051, pp. 22–40, 44; Brief for Petitioners in No. 87–2012, pp. 12–20. Neither the District Court nor the Court of Appeals determined whether petitioners had standing to challenge any particular provision of the ordinance. Although neither side raises the issue here, we are required to address the issue even if the courts below have not passed on it, see *Jenkins* v. *McKeithen*, 395 U. S. 411, 421 (1969), and even if the parties fail to raise the issue before

us.  The federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines." *Allen* v. *Wright*, 468 U. S. 737, 750 (1984).

> "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it.  *Mitchell* v. *Maurer*, 293 U. S. 237, 244 (1934).  See *Juidice* v. *Vail*, 430 U. S. 327, 331–332 (1977) (standing).  'And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it.'"  *Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534, 541 (1986).

It is a long-settled principle that standing cannot be "inferred argumentatively from averments in the pleadings," *Grace* v. *American Central Ins. Co.*, 109 U. S. 278, 284 (1883), but rather "must affirmatively appear in the record." *Mansfield C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379, 382 (1884).  See *King Bridge Co.* v. *Otoe County*, 120 U. S. 225, 226 (1887) (facts supporting Article III jurisdiction must "appea[r] affirmatively from the record").  And it is the burden of the "party who seeks the exercise of jurisdiction in his favor," *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189 (1936), "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Warth* v. *Seldin*, 422 U. S. 490, 518 (1975).  Thus, petitioners in this case must "allege . . . facts essential to show jurisdiction.  If [they] fai[l] to make the necessary allegations, [they have] no standing." *McNutt, supra,* at 189.

The ordinance challenged here prohibits the issuance of a license to an applicant who has resided with an individual whose license application has been denied or revoked within

the preceding 12 months.[1]   The ordinance also has a civil disability provision, which disables those who have been convicted of certain enumerated crimes as well as those whose spouses have been convicted of the same enumerated crimes. This civil disability lasts for two years in the case of misdemeanor convictions and five years in the case of conviction of a felony or of more than two misdemeanors within a 24-month period.[2]   Thus, under the amended ordinance, once the dis-

---

[1] Section 41A–5(a)(5) provides as follows: "The chief of police shall approve the issuance of a license . . . unless he finds [that] . . . [a]n applicant is residing with a person who has been denied a license by the city to operate a sexually oriented business within the preceding 12 months, or residing with a person whose license to operate a sexually oriented business has been revoked within the preceding 12 months."

[2] Sections 41A–5(a)(10), (b), and (c), as amended, provide as follows:

"The chief of police shall approve the issuance of a license . . . unless he finds [that] . . .

"(10) An applicant or an applicant's spouse has been convicted of a crime:
"(A) involving:
"(i) any of the following offenses as described in Chapter 43 of the Texas Penal Code:
"(aa) prostitution;
"(bb) promotion of prostitution;
"(cc) aggravated promotion of prostitution;
"(dd) compelling prostitution;
"(ee) obscenity;
"(ff) sale, distribution, or display of harmful material to minor;
"(gg) sexual performance by a child;
"(hh) possession of child pornography;
"(ii) any of the following offenses as described in Chapter 21 of the Texas Penal Code:
"(aa) public lewdness;
"(bb) indecent exposure;
"(cc) indecency with a child;
"(iii) sexual assault or aggravated sexual assault as described in Chapter 22 of the Texas Penal Code;
"(iv) incest, solicitation of a child, or harboring a runaway child as described in Chapter 25 of the Texas Penal Code; or
"(v) criminal attempt, conspiracy, or solicitation to commit any of the foregoing offenses;

ability period has elapsed, the applicant may not be denied a license on the ground of a former conviction.

Examination of the record here reveals that no party has standing to challenge the provision involving those residing with individuals whose licenses were denied or revoked. Nor does any party have standing to challenge the civil disability provision disabling applicants who were either convicted of the specified offenses or whose spouses were convicted.

First, the record does not reveal that any party before us was living with an individual whose license application was denied or whose license was revoked. Therefore, no party has standing with respect to § 41A–5(a)(5). Second, § 41A–5(a)(10) applies to applicants whose spouses have been convicted of any of the enumerated crimes, but the record reveals only one individual who could be disabled under this provision. An individual, who had been convicted under the Texas Controlled Substances Act, asserts that his wife was interested in opening a sexually oriented business. But the wife, although an officer of petitioner Bi-Ti Enterprises, Inc.,

---

"(B) for which:

"(i) less than two years have elapsed since the date of conviction or the date of release from confinement imposed for the conviction, whichever is the later date, if the conviction is of a misdemeanor offense;

"(ii) less than five years have elapsed since the date of conviction or the date of release from confinement for the conviction, whichever is the later date, if the conviction is of a felony offense; or

"(iii) less than five years have elapsed since the date of the last conviction or the date of release from confinement for the last conviction, whichever is the later date, if the convictions are of two or more misdemeanor offenses or combination of misdemeanor offenses occurring within any 24-month period.

"(b) The fact that a conviction is being appealed shall have no effect on the disqualification of the applicant or applicant's spouse.

"(c) An applicant who has been convicted or whose spouse has been convicted of an offense listed in Subsection (a)(10) may qualify for a sexually oriented business license only when the time period required by Section 41A–5(a)(10)(B) has elapsed."

is not an applicant for a license or a party to this action. See 12 Record, Evert Affidavit 3–6. Cf. *Bender*, 475 U. S., at 548, and n. 9.

Even if the wife did have standing, her claim would now be moot. Her husband's convictions under the Texas Controlled Substances Act would not now disable her from obtaining a license to operate a sexually oriented business, because the city council, following the District Court's decision, deleted the provision disabling those with convictions under the Texas Controlled Substances Act or Dangerous Drugs Act. App. H. to Pet. for Cert. in No. 87–2012, p. 107. See *Hall* v. *Beals*, 396 U. S. 45, 48 (1969).

Finally, the record does not reveal any party who has standing to challenge the provision disabling an applicant who was convicted of any of the enumerated crimes. To establish standing to challenge that provision the individual must show both (1) a conviction of one or more of the enumerated crimes, and (2) that the conviction or release from confinement occurred recently enough to disable the applicant under the ordinance. See §§ 41A–5(a)(10)(A), (B). If the disability period has elapsed, the applicant is not deprived of the possibility of obtaining a license and, therefore, cannot be injured by the provision.

The only party who could plausibly claim to have standing to challenge this provision is Bill Staten, who stated in an affidavit that he had been "convicted of three misdemeanor obscenity violations within a twenty-four month period." 7 Record, Staten Affidavit 2. That clearly satisfies the first requirement. Under the ordinance, any person convicted of two or more misdemeanors "within any 24-month period," must wait five years following the last conviction or release from confinement, whichever is later, before a license may be issued. See § 41A–5(a)(10)(B)(iii). But Staten failed to state when he had been convicted of the last misdemeanor or the date of release from confinement and, thus, has failed "clearly to allege facts demonstrating that he is a proper

party" to challenge the civil disability provisions. No other petitioner has alleged facts to establish standing, and the District Court made no factual findings that could support standing. Accordingly, we conclude that the petitioners lack standing to challenge the provisions. See *Warth*, 422 U. S., at 518.

At oral argument, the city's attorney responded as follows when asked whether there was standing to challenge the civil disability provisions: "I believe that there are one or two of the Petitioners that have had their licenses denied based on criminal conviction." Tr. of Oral Arg. 32. See also Foster Affidavit 1 (affidavit filed by the city in its Response to Petitioner's Application for Recall and Stay of the Mandate stating that two licenses were *revoked* on the grounds of a prior conviction since the ordinance went into effect but failing to identify the licensees). We do not rely on the city's representations at argument as "the necessary factual predicate may not be gleaned from the briefs and arguments themselves," *Bender, supra,* at 547. And we may not rely on the city's affidavit, because it is evidence first introduced to this Court and "is not in the record of the proceedings below," *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 157, n. 16 (1970). Even if we could take into account the facts as alleged in the city's affidavit, it fails to identify the individuals whose licenses were revoked and, therefore, falls short of establishing that any petitioner before this Court has had a license revoked under the civil disability provisions.

Because we conclude that no petitioner has shown standing to challenge either the civil disability provisions or the provisions involving those who live with individuals whose licenses have been denied or revoked, we conclude that the courts below lacked jurisdiction to adjudicate petitioners' claims with respect to those provisions. We accordingly vacate the judgment of the Court of Appeals with respect to those provisions with directions to dismiss that portion of the action. See *Bender, supra,* at 549 (vacating judgment below on

ground of lack of standing); *McNutt*, 298 U. S., at 190 (same).[3]

## IV

' The motel owner petitioners challenge two aspects of the ordinance's requirement that motels that rent rooms for fewer than 10 hours are sexually oriented businesses and are, therefore, regulated under the ordinance. See § 41A–18(a). First, they contend that the city had an insufficient factual basis on which to conclude that rental of motel rooms for fewer than 10 hours produced adverse impacts. Second, they contend that the ordinance violates privacy rights, especially the right to intimate association.

With respect to the first contention, the motel owners assert that the city has violated the Due Process Clause by failing to produce adequate support for its supposition that renting rooms for fewer than 10 hours results in increased crime or other secondary effects. They contend that the council had before it only a 1977 study by the city of Los Angeles that considered cursorily the effect of adult motels on surrounding neighborhoods. See Defendant's Motion for Summary Judgment, Vol. 2, Exh. 11. The Court of Appeals thought it reasonable to believe that shorter rental time periods indicate that the motels foster prostitution and that this type of criminal activity is what the ordinance seeks to suppress. See 837 F. 2d, at 1304. Therefore, no more extensive studies were required than those already available. We agree with the Court of Appeals that the reasonableness of the legislative judgment, combined with the Los Angeles study, is adequate to support the city's determination that motels permitting room rentals for fewer than 10 hours should be included within the licensing scheme.

---

[3] Petitioners also raise a variety of other First Amendment challenges to the ordinance's licensing scheme. In light of our conclusion that the licensing requirement is unconstitutional because it lacks essential procedural safeguards and that no petitioner has standing to challenge the residency or civil disability provisions, we do not reach those questions.

The motel owners also assert that the 10-hour limitation on the rental of motel rooms places an unconstitutional burden on the right to freedom of association recognized in *Roberts* v. *United States Jaycees*, 468 U. S. 609, 618 (1984) ("Bill of Rights . . . must afford the formation and preservation of certain kinds of highly personal relationships"). The city does not challenge the motel owners' standing to raise the issue whether the associational rights of their motel patrons have been violated. There can be little question that the motel owners have "a live controversy against enforcement of the statute" and, therefore, that they have Art. III standing. *Craig* v. *Boren*, 429 U. S. 190, 192 (1976). It is not clear, however, whether they have prudential, *jus tertii* standing to challenge the ordinance on the ground that the ordinance infringes the associational rights of their motel patrons. *Id.*, at 193. But even if the motel owners have such standing, we do not believe that limiting motel room rentals to 10 hours will have any discernible effect on the sorts of traditional personal bonds to which we referred in *Roberts*. Any "personal bonds" that are formed from the use of a motel room for fewer than 10 hours are not those that have "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." 468 U. S., at 618–619. We therefore reject the motel owners' challenge to the ordinance.

Finally, the motel owners challenge the regulations on the ground that they violate the constitutional right "to be let alone," *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting), and that the ordinance infringes the motel owners' commercial speech rights. Because these issues were not pressed or passed upon below, we decline to consider them. See, *e. g.*, *Rogers* v. *Lodge*, 458 U. S. 613, 628, n. 10 (1982); *FTC* v. *Grolier Inc.*, 462 U. S. 19, 23, n. 6 (1983).

Accordingly, the judgment below is affirmed in part, reversed in part, and vacated in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in the judgment.

I concur in the judgment invalidating the Dallas licensing provisions, as applied to any First Amendment-protected business, because I agree that the licensing scheme does not provide the procedural safeguards required under our previous cases.[1] I also concur in the judgment upholding the provisions applicable to adult motels, because I agree that the motel owners' claims are meritless. I agree further that it is not necessary to reach petitioners' other First Amendment challenges. I write separately, however, because I believe that our decision two Terms ago in *Riley* v. *National Fed-*

---

[1] JUSTICE SCALIA's opinion concurring in part and dissenting in part, purportedly grounded in my opinion in *Ginzburg* v. *United States*, 383 U. S. 463 (1966), does not persuade me otherwise. In *Ginzburg*, this Court held merely that, in determining whether a given publication was obscene, a court could consider as relevant evidence not only the material itself but also evidence showing the circumstances of its production, sale, and advertising. *Id.*, at 465–466. The opinion concluded: "It is important to stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged." *Id.*, at 475. As JUSTICE O'CONNOR's opinion makes clear, *ante* at 220, there is no "obscenity vel non" question in this case.

What *Ginzburg* did not do, and what this Court has never done, despite JUSTICE SCALIA's claims, is to abrogate First Amendment protection for an entire category of speech-related businesses. We said in *Ginzburg* that we perceived "no threat to First Amendment guarantees in thus holding that in close cases evidence of pandering may be probative with respect to the nature of the material in question." 383 U. S., at 474. History has proved us right, I think, that the decision itself left First Amendment guarantees secure. JUSTICE SCALIA's transmogrification of *Ginzburg*, however, is far from innocuous.

*eration of Blind of N. C., Inc.,* 487 U. S. 781 (1988), mandates application of all three of the procedural safeguards specified in *Freedman* v. *Maryland,* 380 U. S. 51 (1965), not just two of them, and also to point out that Part III of JUSTICE O'CONNOR's opinion reaches a question not necessary to the decision.

I

In *Freedman* v. *Maryland, supra,* as JUSTICE O'CONNOR notes, we held that three procedural safeguards are needed to "obviate the dangers of a censorship system": (1) any prior restraint in advance of a final judicial determination on the merits must be no longer than that necessary to preserve the status quo pending judicial resolution; (2) a prompt judicial determination must be available; and (3) the would-be censor must bear both the burden of going to court and the burden of proof in court. 380 U. S., at 58–59. *Freedman* struck down a statute that required motion picture houses to submit films for prior approval, without providing any of these protections. Similar cases followed, *e. g., Teitel Film Corp.* v. *Cusack,* 390 U. S. 139 (1968) (invalidating another motion picture censorship ordinance for failure to provide adequate *Freedman* procedures); *Blount* v. *Rizzi,* 400 U. S. 410 (1971) (invalidating postal rules permitting restrictions on the use of the mails for allegedly obscene materials because the rules lacked *Freedman* safeguards); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975) (finding unconstitutional a city's refusal to rent municipal facilities for a musical because of its content, absent *Freedman* procedures).

We have never suggested that our insistence on *Freedman* procedures might vary with the particular facts of the prior restraint before us. To the contrary, this Court has continued to require *Freedman* procedures in a wide variety of contexts. In *National Socialist Party of America* v. *Skokie,* 432 U. S. 43 (1977), we held that even a court-ordered injunction must be stayed if appellate review is not expedited.

*Id.*, at 44. And in *Vance* v. *Universal Amusement Co.*, 445 U. S. 308 (1980), we held that a general public nuisance statute could not be applied to enjoin a motion picture theater's future exhibition of films for a year, based on a presumption that such films would be obscene merely because prior films had been, when such a determination could be constitutionally made only in accordance with *Freedman* procedures. 445 U. S., at 317.

Two Terms ago, in *Riley*, this Court applied *Freedman* to a professional licensing scheme because the professionals involved, charity fundraisers, were engaged in First Amendment-protected activity. We held that, even if North Carolina's interest in licensing fundraisers was sufficient to justify such a regulation, it "must provide that the licensor 'will, within a specified brief period, either issue a license or go to court.'" 487 U. S., at 802, quoting and applying *Freedman*, *supra*, at 59. The North Carolina statute did not so provide, and we struck it down. 487 U. S., at 802.

In *Riley*, this Court, to be sure, discussed the failure of the North Carolina statute to set a time limit for actions on license applications, but it also held that the *licensor* must be required to go to court, not the would-be fundraiser. Because I see no relevant difference between the fundraisers in *Riley* and the bookstores and motion picture theaters in these cases, I would hold that the city of Dallas must bear the burden of going to court and proving its case before it may permissibly deny licenses to First Amendment-protected businesses.

JUSTICE O'CONNOR bases her disinclination to require the third *Freedman* procedure on two grounds: the Dallas licensing scheme does not involve an administrator's passing judgment on whether the content of particular speech is protected or not; and the Dallas scheme licenses entire businesses, not just individual films. JUSTICE O'CONNOR finds the first distinction significant on the theory that our jurisprudence holds only that suppression of speech on the ostensible ground of

content is presumptively invalid. She finds the second significant because it anticipates that applicants with an entire business at stake will pursue their interests in court rather than abandon them.

While JUSTICE O'CONNOR is certainly correct that these aspects distinguish the facts before us from those in *Freedman*, neither ground distinguishes these cases from *Riley*. The licensor in *Riley* was not required to distinguish between protected and unprotected speech. He was reviewing applications to practice a particular profession, just as the city of Dallas is acting on applications to operate particular businesses. Similarly, the fundraisers in *Riley* had their entire livelihoods at stake, just as the bookstores and others subject to the Dallas ordinance. Nonetheless, this Court placed the burden of going to court on the State, not the applicant.[2] 487 U. S., at 802.

Moreover, I believe *Riley* was rightly decided for the same reasons that the limitation set forth in JUSTICE O'CONNOR's opinion is wrong. The danger posed by a license that prevents a speaker from speaking at all is not derived from the basis on which that license was purportedly denied. The danger posed is the unlawful stifling of speech that results. As we said in *Freedman*, it is "the transcendent value of speech" that places the burden of persuasion on the State. 380 U. S., at 58. The heavy presumption against prior restraints requires no less. JUSTICE O'CONNOR does not, nor could she, contend that those administering this ordinance will always act according to their own law. Mistakes are inevitable; abuse is possible. In distributing the burdens of initiating judicial proceedings and proof, we are obliged

---

[2] *Vance* v. *Universal Amusement Co.*, 445 U. S. 308 (1980), also involved censorship that threatened proprietors' entire businesses, rather than single films. This Court, notwithstanding, affirmed the Court of Appeals which had held that the statute was unconstitutional because it lacked the procedural safeguards required under *Freedman*. 445 U. S., at 314, 317.

to place them such that we err, if we must, on the side of speech, not on the side of silence.

## II

In Part III of the opinion, JUSTICE O'CONNOR considers at some length whether petitioners have made an adequate showing of standing to bring their claims against the cohabitation and civil disability provisions of the licensing scheme. Were it of some precedential value, I would question this Court's reversal of the findings of both the District Court and the Court of Appeals[3] that petitioners had standing to bring their claims, where the basis for reversal is an affidavit that is at worst merely ambiguous. But because the discussion is wholly extraneous to the actual holding in this case, I write only to clarify that Part III is unnecessary to the decision and is pure dictum.

The first claim for which the Court fails to find a petitioner with standing—an unspecified objection to the provision denying a license to any applicant residing with someone whose own application has been denied or revoked within the past year—is not directly presented by the parties, was not reached by the court below, and is not among the questions on which certiorari was granted. The second claim for which the Court fails to find a petitioner with standing—petitioners' objection to the ordinance's civil disability provisions—is clearly before this Court, but consideration of this claim is rendered redundant by JUSTICE O'CONNOR's holding in Part II.

The civil disability claim is an objection to that part of the licensing scheme which provides for denial or revocation of a license because of prior criminal convictions, on the ground

---

[3] Both the District Court and the Fifth Circuit, after finding that plaintiffs had standing to challenge the ordinance, reached the civil disability question. See 837 F. 2d 1298, 1301, 1304–1305 (1988); *Dumas* v. *Dallas*, 648 F. Supp. 1061 (ND Tex. 1986).

that these provisions "impose an impermissible prior restraint upon protected expression." Brief for Petitioners FW/PBS, Inc., et al. 12.[4] Because the challenge is based solely on the First Amendment, a victory on the merits would benefit only those otherwise regulated businesses which are protected by the First Amendment.

But since the Court invalidates the application of the entire Dallas licensing scheme to any First Amendment-protected business under the *Freedman* doctrine, it is unnecessary to decide whether some or all of the same provisions are also invalid, as to First Amendment-protected businesses, on other grounds. JUSTICE O'CONNOR recognizes this and wisely declines to reach petitioners' challenge to various requirements under the licensing scheme, other than the civil disability and cohabitation provisions, on the First Amendment ground that the ordinance impermissibly singles out persons and businesses engaged in First Amendment-protected activities for regulation.[5]

For reasons unexplained and inexplicable, the opinion separates the prior restraint and singling out claims and accords them different treatment. Perhaps, if the inquiry had reached the merits of the prior restraint claim, one could infer a motive to take the opportunity to offer guidance in an area of the law badly in need of it. But because the inquiry proceeds no further than jurisdiction, no such explanation is available. Whatever the reason for including Part III, it is superfluous.

[4] Petitioners M. J. R., Inc., et al. phrase the same objection slightly differently. They characterize license denial or revocation based on certain listed prior speech offenses as a "classic prior restraint of the type prohibited as facially unconstitutional under the rule of *Near* v. *Minnesota [ex rel. Olson]*, 283 U. S. 697 (1931)," and they characterize license denial or revocation based on other listed prior offenses as "prior restraints which cannot withstand strict scrutiny and are therefore invalid under the first amendment." See Brief for Petitioners M. J. R., Inc., et al. 22, 33.

[5] See Brief for Petitioners FW/PBS, Inc., et al. 21–24.

JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.

I join Parts I, III, and IV of the Court's opinion but do not agree with the conclusion in Part II that the Dallas ordinance must include two of the procedural safeguards set forth in *Freedman* v. *Maryland*, 380 U. S. 51 (1965), in order to defeat a facial challenge. I would affirm the Fifth Circuit's holding that *Freedman* is inapplicable to the Dallas scheme.

The Court has often held that when speech and nonspeech elements "are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968). See also *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 298–299 (1984); *Cox* v. *Louisiana*, 379 U. S. 559, 562–564 (1965); *Adderley* v. *Florida*, 385 U. S. 39, 48, n. 7 (1966). Our cases upholding time, place, and manner restrictions on sexually oriented expressive activity are to the same effect. See *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986); *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976). Time, place, and manner restrictions are not subject to strict scrutiny and are sustainable if they are content neutral, are designed to serve a substantial governmental interest, and do not unreasonably limit alternative means of communication. *Renton, supra,* at 47. See also *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 647–648 (1981); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976). *Renton* and *Young* also make clear that there is a substantial governmental interest in regulating sexually oriented businesses because of their likely deleterious effect on the areas surrounding them and that such regulation, although focusing on a limited class of businesses involved in expressive activity, is to be treated as content neutral.

JUSTICE O'CONNOR does not suggest that the businesses involved here are immune from the kind of regulation sustained in *Young* and *Renton.* Neither is it suggested that the prerequisites for obtaining a license, such as certificates of occupancy and inspections, do not serve the same kind of a substantial governmental interest dealt with in those cases nor that the licensing system fails the test of content neutrality. The ordinance in no way is aimed at regulating what may be sold or offered in the covered businesses. With a license, operators can sell anything but obscene publications. Without one—without satisfying the licensing requirements—they can sell nothing because the city is justified in enforcing the ordinance to avoid the likely unfavorable consequences attending unregulated sexually oriented businesses.

JUSTICE O'CONNOR nevertheless invalidates the licensing provisions for failure to provide some of the procedural requirements that *Freedman* v. *Maryland, supra,* imposed in connection with a Maryland law forbidding the exhibition of any film without the approval of a board of censors. There, the board was approving or disapproving every film based on its view of the film's content and its suitability for public viewing. Absent procedural safeguards, the law imposed an unconstitutional prior restraint on exhibitors. As I have said, however, nothing like that is involved here; the predicate identified in *Freedman* for imposing its procedural requirements is absent in these cases.

Nor is there any other good reason for invoking *Freedman.* The Dallas ordinance is in many respects analogous to regulations requiring parade or demonstration permits and imposing conditions on such permits. Such regulations have generally been treated as time, place, and manner restrictions and have been upheld if they are content neutral, serve a substantial governmental interest, and leave open alternative avenues of communication. *Cox* v. *New Hampshire*, 312 U. S. 569, 574–576 (1941); *Clark* v. *Community for Creative Non-Violence, supra,* at 293–298. The Dallas scheme regu-

lates who may operate sexually oriented businesses, including those who sell materials entitled to First Amendment protection; but the ordinance does not regulate content and thus it is unlike the content-based prior restraints that this Court has typically scrutinized very closely. See, *e. g.*, *Near v. Minnesota ex rel. Olson*, 283 U. S. 697 (1931); *National Socialist Party of America v. Skokie*, 432 U. S. 43 (1977); *Vance v. Universal Amusement Co.*, 445 U. S. 308 (1980); *Freedman v. Maryland, supra.*

Licensing schemes subject to First Amendment scrutiny, however, even though purporting to be time, place, and manner restrictions, have been invalidated when undue discretion has been vested in the licensor. Unbridled discretion with respect to the criteria used in deciding whether or not to grant a license is deemed to convert an otherwise valid law into an unconstitutional prior restraint. *Shuttlesworth v. Birmingham*, 394 U. S. 147, 150–152 (1969); *Lakewood v. Plain Dealer Publishing Co.*, 486 U. S. 750, 757 (1988); *Staub v. City of Baxley*, 355 U. S. 313 (1958); *Niemotko v. Maryland*, 340 U. S. 268 (1951); *Kunz v. New York*, 340 U. S. 290 (1951); *Saia v. New York*, 334 U. S. 558 (1948). That rule reflects settled law with respect to licensing in the First Amendment context. But here there is no basis for invoking *Freedman* procedures to protect against arbitrary use of the discretion conferred by the ordinance before us. Here, the Court of Appeals specifically held that the ordinance did not vest undue discretion in the licensor because the ordinance provides sufficiently objective standards for the chief of police to apply. 837 F. 2d 1298, 1305–1306 (CA5 1988). JUSTICE O'CONNOR's opinion does not disturb this aspect of the Court of Appeals' decision, and because it does not, one arguably tenable reason for invoking *Freedman* disappears.

Additionally, petitioners' reliance on *Riley v. National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988), is misplaced. *Riley* invalidated a licensing requirement for professional fundraisers which prevented them from solicit-

ing prior to obtaining a license, but which permitted non-professionals to solicit while their license applications were pending. We there held that a professional fundraiser was a speaker entitled to First Amendment protection and that because "the State's asserted power to license professional fundraisers carries with it (unless properly constrained) the power directly and substantially to affect the speech they utter," *id.*, at 801, the requirement was subject to First Amendment scrutiny to make sure that the licensor's discretion was suitably confined. *Riley* thus appears to be a straightforward application of the "undue-discretion" line of cases. The Court went on to say, however, that even assuming, as North Carolina urged, that the licensing requirement was a time, place, and manner restriction, *Freedman* v. *Maryland*, 380 U. S. 51 (1965), required that there be provision for either acting on the license application or going to court within a specified brief period of time.

Contrary to the ordinance in these cases, the *Riley* licensing requirement was aimed directly at speech. The discretion given the licensors in *Riley* empowered them to affect the content of the fundraiser's speech, unless that discretion was suitably restrained. In that context, the Court invoked *Freedman*. That basis for applying *Freedman* is not present here, for, as I have said, the licensor is not vested with undue discretion.

Neither is there any basis for holding that businesses dealing in expressive materials have been singled out; all sexually oriented businesses—including those not involved in expressive activity such as escort agencies—are covered, and all other businesses must live up to the building codes, as well as fire and health regulations. Furthermore, the Court should not assume that the licensing process will be unduly prolonged or that inspections will be arbitrarily delayed. There is no evidence that this has been the case, or that inspections in other contexts have been delayed or neglected. Between the time of the District Court's judgment and that of the

Fifth Circuit, Dallas granted some 147 out of 165 license requests, and none of the petitioners in making this facial challenge to the ordinance asserts that its license application was not promptly dealt with, that it was unable to obtain the required inspections promptly, or that it was unable to secure reasonably prompt review of a denial. Clearly the licensing scheme neither imposes nor results in a ban of any type of adult business.

I see no basis for invalidating this ordinance because it fails to include some prophylactic measures that will guard against highly speculative injuries. As JUSTICE O'CONNOR notes in the course of refusing to apply one of the *Freedman* procedural mandates, the licensing in these cases is required of sexually oriented businesses, enterprises that will have every incentive to pursue the license applications vigorously. *Ante*, at 229–230. The ordinance requires that an application be acted on within 30 days. Licensing decisions suspending or revoking a license are immediately appealable to a permit and license appeal board and are stayed pending that appeal. In addition, no one suggests that licensing decisions are not subject to immediate appeal to the courts. As I see it, there is no realistic prospect that the requirement of a license will have anything more than an incidental effect on the sale of protected materials.

Perhaps JUSTICE O'CONNOR is saying that those who deal in expressive materials are entitled to special procedures in the course of complying with otherwise valid, neutral regulations generally applicable to all businesses. I doubt, however, that bookstores or radio or television stations must be given special breaks in the enforcement of general health, building, and fire regulations. If they must, why would not a variety of other kinds of businesses, like supermarkets and convenience stores that sell books and magazines, also be so entitled? I question that there is authority to be found in our cases for such a special privilege.

For the foregoing reasons, I respectfully dissent from Part II of JUSTICE O'CONNOR's opinion.

JUSTICE STEVENS, concurring in part and dissenting in part.

As the Court explains in Part III of its opinion, it is not certain that any petitioner has standing to challenge the provisions of the licensing scheme that disqualify applicants who are themselves unqualified or who reside with, or are married to, unqualified persons. Given the breadth of those provisions, the assertions in the Staten and Foster affidavits, and the District Court's understanding of the relevant facts, however, I cannot join the decision to direct dismissal of this portion of the litigation. See *ante*, at 235. I would remand for an evidentiary hearing on the standing issues.

I join Parts I, II, and IV of JUSTICE O'CONNOR's opinion. With respect to JUSTICE SCALIA's proposed resurrection of *Ginzburg* v. *United States,* 383 U. S. 463 (1966), I have this comment. As I explained in my dissenting opinion in *Splawn* v. *California,* 431 U. S. 595, 602 (1977), *Ginzburg* was decided before the Court extended First Amendment protection to commercial speech and cannot withstand our decision in *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976). If conduct or communication is protected by the First Amendment, it cannot lose its protected status by being advertised in a truthful and inoffensive manner. Any other result would be perverse:

> "Signs which identify the 'adult' character of a motion picture theater or of a bookstore convey the message that sexually provocative entertainment is to be found within . . . . Such signs . . . provide a warning to those who find erotic materials offensive that they should shop elsewhere for other kinds of books, magazines, or entertainment. Under any sensible regulatory scheme, truthful description of subject matter that is pleasing to

some and offensive to others ought to be encouraged, not punished." 431 U. S., at 604.

JUSTICE SCALIA, concurring in part and dissenting in part.

I join Part I of the Court's opinion, Part III, holding that there is no standing to challenge certain portions of the Dallas ordinance, and Part IV, sustaining on the merits certain other portions. I dissent from the judgment, however, because I would affirm the Fifth Circuit's holding that the ordinance is constitutional in all respects before us.

I

Since this Court first had occasion to apply the First Amendment to materials treating of sex, some three decades ago, we have been guided by the principle that "sex and obscenity are not synonymous," *Roth* v. *United States*, 354 U. S. 476, 487 (1957). The former, we have said, the Constitution permits to be described and discussed. The latter is entirely unprotected, and may be allowed or disallowed by States or communities, as the democratic majority desires.

Distinguishing the one from the other has been the problem. Obscenity, in common understanding, is material that "treat[s] sex in a manner appealing to prurient interest," *id.*, at 488. But for constitutional purposes we have added other conditions to that definition, out of an abundance of concern that "the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest." *Ibid.* To begin with, we rejected the approach previously adopted by some courts, which would permit the banning of an entire literary work on the basis of one or several passages that in isolation could be considered obscene. Instead, we said, "the dominant theme of the material *taken as a whole*" must appeal to prurient interest. *Id.*, at 489 (emphasis added). We have gone on to add other conditions, which are reflected in the three-part test pronounced in *Miller* v. *California*, 413 U. S. 15, 24 (1973):

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

These standards' immediate purpose and effect—which, it is fair to say, have met with general public acceptance—have been to guarantee the access of all adults to such works of literature, once banned or sought to be banned, as Dreiser's An American Tragedy,[1] Lawrence's Lady Chatterley's Lover,[2] Miller's Tropic of Cancer and Tropic of Capricorn,[3] and Joyce's Ulysses,[4] and to many stage and motion picture productions of genuine dramatic or entertainment value that contain some sexually explicit or even erotic material.

Application of these standards (or, I should say, misapplication of them) has had another effect as well—unintended and most certainly not generally approved. The Dallas ordinance at issue in these cases is not an isolated phenomenon. It is one example of an increasing number of attempts throughout the country, by various means, not to withhold from the public any particular book or performance, but to prevent the erosion of public morality by the increasingly general appearance of what the Dallas ordinance delicately calls "sexually

---

[1] Held obscene in *Commonwealth* v. *Friede*, 271 Mass. 318, 171 N. E. 472 (1930).

[2] Held obscene in *People* v. *Dial Press, Inc.*, 182 Misc. 416, 48 N. Y. S. 2d 480 (N. Y. Magis. Ct. 1944).

[3] Held obscene in *United States* v. *Two Obscene Books*, 99 F. Supp. 760 (ND Cal. 1951), aff'd *sub nom. Besig* v. *United States*, 208 F. 2d 142 (CA9 1953).

[4] Unsuccessfully challenged as obscene in *United States* v. *One Book Called "Ulysses,"* 5 F. Supp. 182 (SDNY 1933), aff'd, 72 F. 2d 705 (CA2 1934).

oriented businesses." Such businesses flourish throughout the country as they never did before, not only in New York's Times Square, but in much smaller communities from coast to coast. Indeed, as a case we heard last Term demonstrates, they reach even the smallest of communities via telephonic "dial-a-porn." *Sable Communications of California, Inc.* v. *FCC,* 492 U. S. 115 (1989).

While many communities do not object to such businesses, others do, and have sought to eliminate them. Attempts to do so by focusing upon the individual books, motion pictures, or performances that these businesses market are doomed to failure by reason of the very stringency of our obscenity test, designed to avoid any risk of suppressing socially valuable expression. Communities cannot close down "porn-shops" by banning pornography (which, so long as it does not cross the distant line of obscenity, is protected), just as Congress cannot eliminate specialized "dial-a-porn" telephone services by prohibiting individual messages that are "indecent" but not quite obscene. *Id.,* at 131. Consequently, communities have resorted to a number of other means, including stringent zoning laws, see *e. g., Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976) (ordinance adopting unusual zoning technique of requiring sexually oriented businesses to be dispersed rather than concentrated); *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986) (ordinance restricting theaters that show "adult" films to locations comprising about 5% of the community's land area, where the Court of Appeals had found no "commercially viable" sites were available), Draconian sanctions for obscenity which make it unwise to flirt with the sale of pornography, see *Fort Wayne Books, Inc.* v. *Indiana,* 489 U. S. 46 (1989) (state Racketeer Influenced and Corrupt Organizations (RICO) statute), and the ordinance we have before us today, a licensing scheme purportedly designed to assure that porn-shops are run by a better class of person. Not only are these oblique methods less than entirely effective in eliminating the

perceived evil at which they are directed (viz., the very existence of sexually oriented businesses anywhere in the community that does not want them), but they perversely render less effective our efforts, through a restrictive definition of obscenity, to prevent the "chilling" of socially valuable speech.   State RICO penalties for obscenity, for example, intimidate not just the porn-shop owner, but also the general bookseller who has been the traditional seller of new books such as Ulysses.

It does not seem to me desirable to perpetuate such a regime of prohibition by indirection.   I think the means of rendering it unnecessary is available under our precedents and should be applied in the present cases.   That means consists of recognizing that a business devoted to the sale of highly explicit sexual material can be found to be engaged in the marketing of obscenity, even though each book or film it sells might, in isolation, be considered merely pornographic and not obscene.   It is necessary, to be sure of protecting valuable speech, that we compel all communities to tolerate individual works that have only marginal communicative content beyond raw sexual appeal; it is not necessary that we compel them to tolerate businesses that hold themselves forth as specializing in such material.   Because I think that Dallas could constitutionally have proscribed the commercial activities that it chose instead to license, I do not think the details of its licensing scheme had to comply with First Amendment standards.

## II

The Dallas ordinance applies to any sexually oriented business, which is defined as "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center."   Dallas City Code §41A–2(19) (1986).   Operators of escort agencies and sexual encounter centers are not before us.

"Adult bookstore or adult video store" is defined, *inter alia,* as a "commercial establishment which as one of its *principal business purposes* offers for sale or rental" books or other printed matter, or films or other visual representations, "which depict or describe 'specified sexual activities' or 'specified anatomical areas.'" § 41A–2(2)(A) (emphasis added).[5] "Adult motion picture theater" is defined as a commercial establishment where films "are *regularly* shown" that depict specified sexual activities or specified anatomical areas. § 41A–2(5) (emphasis added).[6] Other sexually oriented businesses are similarly defined as establishments that "regularly" depict or describe specified sexual activities or specified anatomical areas.[7] "Specified sexual activities" means

---

[5] "Adult Bookstore or Adult Video Store means a commercial establishment which as one of its principal business purposes offers for sale or rental for any form of consideration any one or more of the following:

"(A) books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes or video reproductions, slides, or other visual representations which depict or describe 'specified sexual activities' or 'specified anatomical areas'; or

"(B) instruments, devices, or paraphernalia which are designed for use in connection with 'specified sexual activities.'" Dallas City Code §§ 41A–2(2)(A), (B) (1986).

The regulation of businesses that sell the items described in subsection (B) raises no First Amendment question.

[6] "Adult Motion Picture Theater means a commercial establishment where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are regularly shown which are characterized by the depiction or description of 'specified sexual activities' or 'specified anatomical areas.'" § 41A–2(5).

[7] "(3) Adult Cabaret means a nightclub, bar, restaurant, or similar commercial establishment which regularly features:

"(A) persons who appear in a state of nudity; or

"(B) live performances which are characterized by the exposure of 'specified anatomical areas' or by 'specified sexual activities'; or

"(C) films, motion pictures, video cassettes, slides, or other photographic reproductions which are characterized by the depiction or description of 'specified sexual activities' or 'specified anatomical areas.'"

"(A) the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts;

"(B) sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy;

"(C) masturbation, actual or simulated; or

"(D) excretory functions as part of or in connection with any of the activities set forth in (A) through (C) above."  § 41A–2(21).

Finally, "specified anatomical areas" means "human genitals in a state of sexual arousal."  § 41A–2(20).

---

"(6) Adult Theater means a theater, concert hall, auditorium, or similar commercial establishment which regularly features persons who appear in a state of nudity or live performances which are characterized by the exposure of 'specified anatomical areas' or by 'specified sexual activities.'

.     .     .     .     .

"(12) Nude Model Studio means any place where a person who appears in a state of nudity or displays 'specified anatomical areas' is provided to be observed, sketched, drawn, painted, sculptured, photographed, or similarly depicted by other persons who pay money or any form of consideration.

"(13) Nudity or a State of Nudity means:

"(A) the appearance of a human bare buttock, anus, male genitals, female genitals, or female breast; or

"(B) a state of dress which fails to opaquely cover a human buttock, anus, male genitals, female genitals, or areola of the female breast."  § 41A–2.

As to nude model studios, the ordinance further provides as a defense to prosecution that

"a person appearing in a state of nudity did so in a modeling class operated:

"(1) by a proprietary school licensed by the state of Texas; a college, junior college, or university supported entirely or partly by taxation;

"(2) by a private college or university which maintains and operates educational programs in which credits are transferrable to a college, junior college, or university supported entirely or partly by taxation; or

"(3) in a structure:

"(A) which has no sign visible from the exterior of the structure and no other advertising that indicates a nude person is available for viewing; and

"(B) where in order to participate in a class a student must enroll at least three days in advance of the class; and

"(C) where no more than one nude model is on the premises at any one time."  § 41A–21(d).

256

As I shall discuss in greater detail presently, this ordinance is unusual in that it does not apply "work by work." It can reasonably be interpreted to restrict not sales of (or businesses that sell) any particular book, film, or entertainment, but only businesses that *specialize* in books, films, or entertainment of a particular type. That places the obscenity inquiry in a different, and broader, context. Our jurisprudence supports the proposition that even though a particular work of pornography is not obscene under *Miller*, a merchant who concentrates upon the sale of such works is engaged in the business of obscenity, which may be entirely prohibited and hence *(a fortiori)* licensed as required here.

The dispositive case is *Ginzburg* v. *United States*, 383 U. S. 463 (1966). There the defendant was convicted of violating the federal obscenity statute, 18 U. S. C. § 1461, by mailing three publications which our opinion assumed, see 383 U. S., at 465–466, were in and of themselves not obscene. We nonetheless upheld the conviction, because the evidence showed "that each of the accused publications was originated or sold as stock in trade of the sordid business of pandering— 'the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers.'" *Id.*, at 467 (quoting *Roth* v. *United States*, 354 U. S., at 495–496 (Warren, C. J., concurring)). JUSTICE BRENNAN's opinion for the Court concluded that the advertising for the publications, which "stressed the[ir] sexual candor," 383 U. S., at 468, "resolve[d] all ambiguity and doubt" as to the unprotected status of the defendants' activities. *Id.*, at 470.

> "The deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. . . . And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the

circumstances, pretense or reality—whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. Certainly in a prosecution which, as here, does not necessarily imply suppression of the materials involved, the fact that they originate or are used as a subject of pandering is relevant to the application of the *Roth* test." *Id.*, at 470–471.

We held one of the three publications in question to be, in the circumstances of its sale, obscene, despite the trial court's finding that only 4 of the 15 articles it contained "predominantly appealed to prurient interest and substantially exceeded community standards of candor," *id.*, at 471; and another to be obscene despite the fact that it previously had been sold by its author to numerous psychiatrists, some of whom testified that they found it useful in their professional practice. We upheld the convictions because the petitioners had "deliberately emphasized the sexually provocative aspects of the work, in order to catch the salaciously disposed." *Id.*, at 472.

In *Memoirs* v. *Attorney General of Massachusetts*, 383 U. S. 413 (1966), decided the same day as *Ginzburg*, we overturned the judgment that a particular book was obscene, but, citing *Ginzburg*, made clear that this did not mean that all circumstances of its distribution would be constitutionally protected. We said:

"On the premise, which we have no occasion to assess, that *Memoirs* has the requisite prurient appeal and is patently offensive, but has only a minimum of social value, the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected. . . . In this proceeding, however, the courts were asked to judge the obscenity of *Memoirs* in the abstract, and

the declaration of obscenity was neither aided nor limited by a specific set of circumstances of production, sale, and publicity. All possible uses of the book must therefore be considered, and the mere risk that the book might be exploited by panderers because it so pervasively treats sexual matters cannot alter the fact . . . that the book will have redeeming social importance in the hands of those who publish or distribute it on the basis of that value." 383 U. S., at 420–421 (footnote omitted).

*Ginzburg* was decided before our landmark *Miller* decision, but we have consistently applied its holding post-*Miller*. See *Hamling* v. *United States*, 418 U. S. 87, 130 (1974); *Splawn* v. *California*, 431 U. S. 595, 597–599 (1977); *Pinkus* v. *United States*, 436 U. S. 293, 303–304 (1978). Although *Ginzburg* narrowly involved the question whether particular publications were obscene, the foundation for its holding is that "the sordid business of pandering," *Ginzburg, supra*, at 467, is constitutionally unprotected—that the sale of material "solely to produce sexual arousal . . . does not escape regulation because [the material] has been dressed up as speech, or in other contexts might be recognized as speech." 383 U. S., at 474, n. 17. But just as *Miller* established some objective criteria concerning what particular publications can be regarded as "appealing to the prurient interest," it impliedly established some objective criteria as to what stock-in-trade can be the raw material (so to speak) of pandering. Giving this limitation full scope, it seems to me that *Ginzburg*, read together with *Miller*, establishes at least the following: The Constitution does not require a State or municipality to permit a business that intentionally specializes in, and holds itself forth to the public as specializing in, performance or portrayal of sex acts, sexual organs in a state of arousal, or live human nudity. In my view that suffices to sustain the Dallas ordinance.

## III

In evaluating the Dallas ordinance under the principles I have described, we must of course give it the benefit of any "limiting construction [that] has been or could be placed" on its text. *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613 (1973). Moreover, we cannot sustain the present facial attack unless the ordinance is "*substantially* overbroad," *id.*, at 615 (emphasis added), that is, "unless it reaches a substantial number of impermissible applications," *New York* v. *Ferber,* 458 U. S. 747, 771 (1982), "judged in relation to the statute's plainly legitimate sweep," *Broadrick, supra,* at 615.

Favorably construed, the Dallas ordinance regulates only the business of pandering, as I have defined it above. It should be noted, to begin with, that the depictions, descriptions, and displays that cause any of the businesses before us to qualify as a "sexually oriented business" must be sexually explicit in more than a minor degree. What is at issue here is not the sort of nude photograph that might commonly appear on a so-called "pin-up calendar" or "men's magazine." The mere portrayal of the naked human body does *not* qualify unless (in the definition of adult cabaret, adult theater, and nude model studio) it is featured live. Qualifying depictions and descriptions do not include human genitals, but only human genitals in a state of sexual arousal, the fondling of erogenous zones, and normal or perverted sexual acts.

In addition, in order to qualify for regulation under the ordinance the business that provides such live nudity or such sexually explicit depictions or descriptions must do so "as one of its principal business purposes" (in the case of adult bookstores and adult video stores) or "regularly" (in the case of adult motion picture theaters, adult cabarets, and adult theaters). The adverb "regularly" can mean "constantly, continually, steadily, sustainedly," Roget's International Thesaurus § 135.7, p. 77 (4th ed. 1977), and also "in a . . . methodical way," Webster's Third New International Dictionary 1913 (1981). I think it can reasonably be interpreted

in the present context to mean a continuous presentation of the sexual material as one of the very objectives of the commercial enterprise. Similarly, the phrase "as one of its principal business purposes" can connote that the material containing the specified depictions and descriptions does not merely account for a substantial proportion of sales volume but is also intentionally marketed *as material of that character.*

All of the establishments at issue, therefore, share the characteristics that they offer (1) live nudity or hardcore sexual material, (2) as a constant, intentional objective of their business. But there is still more. With the single exception of "adult motion picture theater," the descriptions of all the establishments at issue contain some language that suggests a requirement that the business hold itself forth to the public precisely as a place where sexual stimulation of the described sort can be obtained. Surely it would be permissible to interpret the phrase "as one of its principal business purposes" in the definition of "adult bookstore or adult video store" to require such holding forth. A business can hardly have as a principal purpose a line of commerce it does not even promote. Likewise, the portion of the definitions of "adult cabaret" and "adult theater" which requires that they regularly "feature" the described sexual material suggests that it must not merely be there but must be promoted or marketed as such. The definition of nude model studio, while containing no such requirement, is subject to a defense which contains as one of its elements that the structure where the studio is located "has no sign visible from the exterior of the structure and no other advertising that indicates a nude person is available for viewing." Dallas City Code § 41A–21(d)(3)(A) (1986). Even the definitions of the two categories of enterprises not at issue in this case, "escort agencies" and "sexual encounter centers," contain language that arguably requires a "holding forth" (a "primary business purpose" requirement). Given these indications of the importance of "holding forth" con-

tained in all except one of the definitions, it seems to me very likely—especially if that should be thought necessary to sustain the constitutionality of the measure—that the Dallas ordinance in all its challenged applications would be interpreted to apply only to businesses that not only (1) offer live nudity or hardcore sexual material, (2) as a constant and intentional objective of their business, but also (3) seek to promote it as such. It seems to me that any business that meets these requirements can properly be described as engaged in "the sordid business of pandering," and is not protected by the First Amendment. Indeed, even the first two requirements alone would suffice to sustain the ordinance, since it is most implausible that any enterprise which has as its constant intentional objective the sale of such material does not advertise or promote it as such; if a few such enterprises bent upon commercial failure should exist, they would certainly not be numerous enough to render the ordinance *substantially* overbroad.

The Dallas ordinance's narrow focus distinguishes these cases from *Schad* v. *Mount Ephraim*, 452 U. S. 61 (1981), in which we held unconstitutional a municipal ordinance that prohibited all businesses offering live entertainment, including but not limited to nude dancing. That ordinance was substantially overbroad because, on its face, it prohibited "a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments." *Id.*, at 65. The Dallas ordinance, however, targets only businesses engaged in unprotected activity.

Even if it were possible to conceive of a business that could meet the above-described qualifications and yet be engaged in First Amendment activities rather than pandering, we do not invalidate statutes as overbroad on the basis of imagination alone. We have always held that we will not apply that "strong medicine" unless the overbreadth is both "real" and "substantial." *Broadrick* v. *Oklahoma*, *supra*, at 613, 615. I think we must sustain the current ordinance just as we sustained the statute at issue in *New York* v. *Ferber*, *supra*,

which forbade the distribution of materials depicting minors in a "sexual performance." The state court had applied overbreadth analysis because of its "understandabl[e] concer[n] that some protected expression, ranging from medical textbooks to pictorials in the National Geographic would fall prey to the statute." *Id.*, at 773. We said:

> "[W]e seriously doubt, and it has not been suggested, that these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach. Nor will we assume that the New York courts will widen the possibly invalid reach of the statute by giving an expansive construction to the proscription on 'lewd exhibition[s] of the genitals.' Under these circumstances, § 263.15 is 'not substantially overbroad and . . . whatever overbreadth may exist should be cured through a case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.' *Broadrick* v. *Oklahoma*, 413 U. S., at 615–616." *Id.*, at 773–774.

The legitimate reach of the Dallas ordinance "dwarfs its arguably impermissible applications." *Id.*, at 773.

To reject the present facial attack upon the ordinance is not, of course, to deprive someone who is not engaged in pandering and who is somehow caught within its provisions (if that could possibly occur) from asserting his First Amendment rights. But that eventuality is so improbable, it seems to me, that no substantial quantity of First Amendment activity is anticipatorily "chilled." The Constitution is adequately safeguarded by conducting further review of this reasonable ordinance as it is applied.

JUSTICE O'CONNOR's opinion correctly notes that respondents conceded that the *materials* sold are protected by the First Amendment. *Ante*, at 224. But they did not concede that the activity of pandering at which the Dallas ordinance is directed is constitutionally protected. They did not, to be

sure, specifically argue *Ginzburg*, or suggest the complete proscribability of these businesses as a basis for sustaining their manner of licensing them. But we have often sustained judgments on grounds not argued—particularly in the area of obscenity law, where our jurisprudence has been, let us say, not entirely predictable. In *Ginzburg* itself, for example, the United States did not argue that the convictions could be upheld on the pandering theory the Court adopted, but only that the materials sold were obscene under *Roth*. Brief for United States in *Ginzburg* v. *United States*, O. T. 1965, No. 42, p. 18. In *Mishkin* v. *New York*, 383 U. S. 502 (1966), one of the companion cases to *Ginzburg*, the State of New York defended the convictions under *Roth* and explicitly disagreed with those commentators who would determine obscenity by looking to the "intent of the disseminator," rather than "character of the material." Brief for Appellee in *Mishkin* v. *New York*, O. T. 1965, No. 49, p. 45, and n. See also Brief for Appellee in *Memoirs* v. *Attorney General of Massachusetts*, O. T. 1965, No. 368, p. 17 (defending convictions under *Roth* and *Manual Enterprises, Inc.* v. *Day*, 370 U. S. 478 (1962)). Likewise in *Roth*, where we held that the test for obscenity was appeal to prurient interest, 354 U. S., at 489, the United States had argued that obscenity was established if the material "constitutes a present threat to the morals of the average person in the community." Brief for United States in *Roth* v. *United States*, O. T. 1956, No. 582, p. 100. And no one argued that the *Miller* Court should abandon the "utterly without redeeming social value" test of the *Memoirs* plurality, but the Court did so nevertheless. Compare 413 U. S., at 24–25, with Brief for Appellee in *Miller* v. *California*, O. T. 1972, No. 70–73, pp. 26–27.

\* \* \*

The mode of analysis I have suggested is different from the rigid test for obscenity that we apply to the determination whether a particular book, film, or performance can be banned. The regulation here is not directed to particular

works or performance, but to their concentration, and the constitutional analysis should be adjusted accordingly. What JUSTICE STEVENS wrote for the plurality in *American Mini Theatres* is applicable here as well: "[W]e learned long ago that broad statements of principle, no matter how correct in the context in which they are made, are sometimes qualified by contrary decisions before the absolute limit of the stated principle is reached." 427 U. S., at 65. The prohibition of concentrated pornography here is analogous to the prohibition we sustained in *American Mini Theatres*. There we upheld ordinances that prohibited the concentration of sexually oriented businesses, each of which (we assumed) purveyed material that was not constitutionally proscribable. Here I would uphold an ordinance that regulates the concentration of sexually oriented material in a single business.

The basis of decision I have described seems to me the proper means, in Chief Justice Warren's words, "to reconcile the right of the Nation and of the States to maintain a decent society and, on the other hand, the right of individuals to express themselves freely in accordance with the guarantees of the First and Fourteenth Amendments." *Jacobellis* v. *Ohio*, 378 U. S. 184, 199 (1964) (dissenting opinion). It entails no risk of suppressing even a single work of science, literature, or art—or, for that matter, even a single work of pornography. Indeed, I fully believe that in the long run it will expand rather than constrict the scope of permitted expression, because it will eliminate the incentive to use, as a means of preventing commercial activity patently objectionable to large segments of our society, methods that constrict unobjectionable activity as well.

For the reasons stated, I respectfully dissent.