686 A.2d 727

**ANNAPOLIS ROAD, LTD., et al.**

v.

**ANNE ARUNDEL COUNTY, Maryland.**

**Jack GRESSER, et ux.**

v.

**ANNE ARUNDEL COUNTY, Maryland.**

**ANNAPOLIS ROAD, LTD.**

v.

**ANNE ARUNDEL COUNTY, Maryland, et al.**

Nos. 460 to 462, Sept.Term, 1996.

Court of Special Appeals of Maryland.

Dec. 26, 1996.

106

William E. Seekford, Towson, and Harry Levy, Baltimore (Robert B. Schulman, Andrew H. Levine and Schulman, Treem, Koniskow & Gilden, P.A., Baltimore, on the brief), for appellants.

David A. Plymyer, Deputy County Attorney (Phillip F. Scheibe, County Attorney, on the brief), Annapolis, for appellees.

Argued before MURPHY, C.J., THIEME, J., and ALAN M. WILNER, Judge, Specially Assigned.

ALAN M. WILNER, Judge, Specially Assigned.

We have before us three appeals testing the validity of (1) an Anne Arundel County ordinance seeking to regulate the location and operation of adult bookstores, film arcades, and motion picture theaters, and (2) an injunction issued by the Circuit Court for Anne Arundel County enforcing that ordinance.

## I. BACKGROUND

For several years, appellant Annapolis Road, Ltd. (ARL) operated an adult bookstore on property owned by appellants Jack and Brindel Gresser at 1656 Annapolis Road in Anne

Arundel County. It sold books, magazines, and videos containing explicit sexual material. It also operated at that location what are sometimes referred to as "peep shows"—private booths containing coin-operated video machines that display similar kinds of material. The battle between ARL and the county over the operation of ARL's business extends back at least to 1984. In May of that year, a county detective seized a number of books and magazines from the store that were found to be obscene. ARL was later convicted in criminal court of unlawfully displaying those items.

At some point, the county enacted an ordinance requiring "peep shows" of the type operated by ARL to have a Class Y license. That ordinance is not now before us, but it appears that some question arose as to whether it was sufficiently specific to pass Constitutional muster. On July 15, 1991, the County Council enacted a second ordinance (Bill No. 68–91) imposing a moratorium on the issuance of Class Y licenses until better standards could be developed. The moratorium took effect August 7, 1991. On July 29, county officials inspected the bookstore and found a number of peep show machines that were not covered by Class Y licenses. ARL closed the business and submitted applications for the required licenses. In light of the moratorium, however, the county took no immediate action on the applications. That led to a lawsuit by ARL in U.S. District Court challenging the moratorium.

On November 21, 1991, the County Council enacted Bill No. 98–91, purporting to deal in a more specific and comprehensive way with the operation of adult bookstores and adult theaters. The enactment of that ordinance, which repealed the existing law governing Class Y licenses and set forth revised procedures for the issuance of those licenses, thus made ARL's challenge to the moratorium and the earlier ordinance moot. The Federal court dismissed the pending action, along with claims that the moratorium itself constituted a violation of ARL's rights under 42 U.S.C. § 1983. That dismissal was affirmed by the U.S. Court of Appeals for the

Fourth Circuit. *Annapolis Road, Limited v. Hagner* (No. 91–1205, 1992 WL 120209, Unpublished Opinion filed June 2, 1992).

In a preamble to Bill No. 98–91, the County Council declared its finding, based on evidence presented to it, that sexually oriented businesses have a harmful effect on the area in which they are located and contribute to neighborhood blight and that they therefore require regulation in order to protect neighborhoods from nuisance and deterioration.

That regulation, as set forth in the ordinance, took two forms. One form was reenactment of the requirement, through the addition of new sections 2–1101 through 2–1113 to art. 16 of the County Code, that "adult film arcades" have a Class Y license in order to operate. The ordinance defined the term "adult film arcade" as a place containing one or more display devices that, for commercial entertainment or amusement purposes, show images depicting sadomasochistic abuse, sexual conduct, or sexual excitement. The ordinance set forth procedures and conditions for applying for the license as well as substantive requirements with respect to the operation of an adult film arcade. Operation of an adult film arcade without a Class Y license was made a misdemeanor and was also subject to injunction.

The second form of regulation, which itself was in two parts, was effected through additions to the county zoning laws contained in art. 28 of the County Code. The first aspect of the zoning regulation was the requirement of a special zoning certificate of use for adult bookstores and adult motion picture theaters. Art. 28, § 1–128(a) already contained a general requirement that no premises or structure, other than a single-family residence, could be used or altered until a zoning certificate of use was issued by the Office of Planning and Zoning. The 1991 ordinance added a new provision, § 1–128(e), requiring a zoning certificate of use specifically for an

"adult bookstore" and an "adult motion picture theater," both of which terms were defined elsewhere in the ordinance.[1] Adult film arcades were included within the definition of "adult motion picture theater." The obtention of the special zoning certificate of use was made a prerequisite to obtaining a Class Y license; a copy of the certificate had to be included with the application for the license.

The second aspect of the zoning regulation was to exclude adult bookstores and adult motion picture theaters entirely from the C1 (Local Retail), C2 (Commercial Office), and C3 (General Commercial) zones, exclude adult motion picture theaters as a *permitted* use in the C4 (Highway Commercial) zone, and restrict those operations as *conditional* uses in the C4 and W3 (Heavy Industrial) districts.[2] Five conditions were imposed on the location of those operations in the C4 and W3 districts, namely:

(1) they had to be at least 1,000 feet from the boundary line of any dwelling, library, park, school, playground, child care center, church or other place of worship, or other adult bookstore or adult motion picture theater;

---

1. Amendments to § 1–101 of art. 28 defined an adult bookstore as a commercial establishment that, as one of its principal business purposes, sells or rents books, magazines, periodicals, or other printed matter, or photographs, motion pictures, videotapes, slides, or other visual representations that depict or describe sadomasochistic abuse, sexual conduct, or sexual excitement, as those terms are defined in Md.Code art. 27, § 416A, or instruments, devices, or paraphernalia designed for use in connection with sexual conduct. An "adult motion picture theater" was defined in § 1–110 as a place in which films of a similar character as those materials contained in an adult bookstore are shown.

2. Under the preexisting law, "bookstores" generally were permitted uses in the C1 and C3 zones and "indoor theaters" or "motion picture theaters" were permitted uses in the C1, C2, C3, and C4 zones. Bill No. 98–91 removed the adult operations from the C1, C2, and C3 zones and as a permitted use in the C4 zone by excluding adult bookstores from the scope of "bookstore" and excluding adult motion picture theaters from the scope of "indoor theater" and "motion picture theater."

(2) all windows, doors, and other apertures had to be blackened or obstructed to prevent persons on the outside from viewing the interior;

(3) the proprietor, owner, and employees were required to prohibit access by anyone under 18 years of age;

(4) if the business was an adult motion picture theater, it was not to be used for the display of obscene films or other performances; and

(5) if it was an adult motion picture theater, it had to have the off-street parking required for theaters generally.

Any existing adult bookstore or adult motion picture theater that would not be in compliance with the new requirements was allowed to continue as a nonconforming use for one year after notice from the Office of Planning and Zoning. By Bill No. 101–92, enacted and signed into law on December 8, 1992, that period was reduced to six months.

ARL chose not to apply for the newly authorized Class Y license but instead reopened its store without a license. On December 4, 1992, after discovering that the business had been reopened, the county filed suit against ARL, contending that it was operating an adult film arcade without a Class Y license. It asked that the operation be enjoined until the license was obtained. The court entered an *ex parte* injunction, followed, on December 18, 1992, by an interlocutory injunction, restraining ARL and its employee from operating an adult film arcade during the pendency of the litigation. That action has resulted in Appeal No. 460.

In June, 1993, ARL filed an action against the county for declaratory and injunctive relief. It acknowledged that its business involved the display, sale, and rental of books, magazines, and videotapes, a portion of which included themes of a sexual nature, although it denied that any of those materials contain descriptions or depictions of sadomasochistic abuse, sexual conduct, or sexual excitement. ARL averred that its operation was in a C3 zone, that its attempts to obtain a Class Y license had been "thwarted by the actions of the County and

the Department of Inspection and Permits," that it had attempted to register the operation as a lawful nonconforming use but was informed that the nonconforming use must cease on June 16, 1993, that the county had notified every owner of land on which adult businesses are operated that those operations must cease, that the licensing and zoning schemes embodied in the ordinance "leaves no existing adult businesses in Anne Arundel County," and that there was no factual basis for such a regulation.

In light of its allegation that none of the materials it displayed contained descriptions or depictions of sadomasochistic abuse or sexual conduct or excitement, ARL asked for a declaratory judgment that it was not subject to Ordinances 98–91 and 101–92. To the extent it *was* subject to those ordinances, it asked for a declaratory judgment that they were "unconstitutional" for a variety of reasons. ARL claimed that the ordinances were invalid because they were impermissibly enacted as emergency legislation and involved more than one subject matter, presumably in contravention of the County Charter. It also averred that they were unconstitutional because (1) they sought to regulate by licensing and zoning requirements conduct subject to criminal penalties, (2) the Class Y licensing fee of $2,500 or $300 for each display device imposed a content-based fee unrelated to the proven cost necessary to regulate the activity, (3) the ordinances constituted an unlawful prior restraint on protected speech with insufficient guidelines to govern the issuance of a zoning certificate of use for adult businesses, (4) they sought to regulate the configuration, lighting, and content of adult film arcades without any basis or reason, (5) they failed to allow for reasonable alternative avenues of communication, (6) they did not further any specific governmental interest, and (7) they were not narrowly tailored to affect only the articulated unwanted secondary effects of adult businesses and thus contained greater restrictions than were necessary to achieve the desired results.

As ancillary relief, ARL asked for an injunction to restrain county officials from taking any action to enforce the ordi-

nances against its business. That case has produced Appeal No. 462.

On August 5, 1993, the county filed the third of the three actions, against the Gressers. The county averred that the Gressers were allowing their property, located in a C3 zone, to be used as an adult bookstore and adult motion picture theater, which uses are limited to C4 and W3 zones as conditional uses. The ability of the Gressers to continue those uses as lawful nonconforming ones expired, said the county, on June 16, 1993, and it therefore asked that the Gressers be enjoined from using the property for any use not allowed in a C3 zone, and specifically as an adult bookstore or adult motion picture theater. That action has produced Appeal No. 461.

On August 12, 1993, the court granted an interlocutory injunction in the second case (No. 462), restraining the county from taking any action to compel ARL to cease operation of its business, pending the action and subject to further order of the court. In October, the court consolidated Cases 2 and 3 (Nos. 462 and 461). The first action (No. 460), in which the court had enjoined ARL from operating an adult film arcade without a Class Y license, proceeded for a time on its own.

On November 3, 1993, this Court affirmed the interlocutory injunction issued in Appeal No. 460, finding no merit in ARL's seven claims of unconstitutionality and charter violations. The Court of Appeals denied ARL's petition for *certiorari* on March 10, 1994; subsequently, the U.S. Supreme Court also denied *certiorari*. In December, 1994, the county enacted yet another ordinance (Bill No. 39–94), which amended § 1–101 of art. 28 to exclude a commercial establishment from the definition of "adult bookstore" if less than 20% of its merchandise on display consists of the books, magazines, devices, or other material specified in the definition or less than 20% of its usable floor area is used for the display of those items.

At some point thereafter, No. 460 was consolidated with the other two cases, and all three were heard in the circuit court on cross motions for summary judgment. In light of the 1994 ordinance and the fact that less than 20% of ARL's stock

consisted of the specified items, the county urged that the operation no longer qualified as an adult bookstore and that those aspects of the cases concerning the operation of an adult bookstore were therefore moot.

On June 7, 1995, the court filed an opinion and order granting the county's motion for summary judgment and ordering that ARL and the Gressers immediately cease the operation of an adult film arcade at the Annapolis Road location. The court noted the county's concession that ARL no longer qualified as an adult bookstore and that its zoning enforcement action was therefore moot, at least as to the bookstore, but decided to address the validity of the zoning provisions anyway. In fact, that is the only aspect of the dispute that the court did address in its opinion; it said very little about the licensing provisions. Nonetheless, the court concluded its opinion with a finding that the entire ordinance was valid and, in its order, directed that appellants immediately cease the operation of the adult film arcade. The court issued no specific ruling regarding the bookstore operation.

The court relied principally on *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), and attempted to follow the analysis used in that case. It noted first that the ordinances did not ban adult bookstores or motion picture theaters entirely but "merely limit the location of adult bookstores and adult film arcades...." The court observed that, under *Renton*, those types of time, place, and manner restrictions on otherwise protected speech were valid so long as they were content-neutral, designed to serve a substantial government interest, and did not unreasonably limit alternative avenues of communication.

Analyzing the ordinance under those standards, the court held the ordinance to be content-neutral in that it was designed to protect communities from the harmful secondary effects of sexually oriented businesses rather than to suppress the content of the speech being disseminated from those businesses. That goal, it held, constituted a substantial government interest. Finally, crediting uncontradicted evidence supplied by the county, the court found that there were 81

sites, comprising 2,300 acres, in the county that were suitable for adult bookstores or film arcades and that, accordingly, there were reasonable alternative avenues of communication. In that last regard, the court rejected ARL's undocumented argument that some of those sites were unsuitable because of their particular physical characteristics, such as the lack of utilities or access by public road.

Just shy of a month after the filing of the court's opinion and order, the U.S. Court of Appeals for the Fourth Circuit filed *en banc* opinions declaring parts of adult bookstore ordinances adopted in Harford and Prince George's Counties invalid. *11126 Baltimore v. Prince George's County, Md.,* 58 F.3d 988 (4th Cir.1995); *Chesapeake B & M, Inc. v. Harford County, Md.,* 58 F.3d 1005 (4th Cir.1995). On the basis of those rulings, ARL and the Gressers filed a motion with the circuit court to alter or amend its judgment. The court denied the motion without comment, and these appeals ensued.

## II. *THE ISSUES*

Notwithstanding that the court's injunction is expressly limited to the adult film arcade operation and appears to be based entirely on the fact that that operation does not have the benefit of a Class Y license, in light of the court's opinion, which, as, noted, sustained the zoning ordinance as well, appellants press their attack on both the zoning and the licensing provisions of the ordinances. In No. 460, they urge that the licensing provisions of Bill No. 98–91, as since amended, are unconstitutional, both facially and as applied, in that they "fail to specifically contain reasonable and permissible specific guidelines for [the licensing authority]." In Nos. 461 and 462, they attack both the licensing and the zoning provisions, arguing that they operate as "an unconstitutional prior restraint of prior speech" and that the court erred in holding that the ordinance provides reasonable alternative avenues of communication.

The county, having had the opportunity to reflect upon the recent decisions of the Fourth Circuit Court of Appeals, now

concedes that "the licensing requirement for adult film arcades codified as Article 16, §§ 2–1101 through 2–1113 of the County Code, and the requirement for a special zoning certificate of use for adult film arcades codified at Article 28, § 1–128(e), both enacted by Bill No. 98–91, are unenforceable...." Responding to appellants' attack on the other zoning provisions, however, it sees these appeals as presenting six issues, which, for clarity, we have combined and rephrased as follows:

(1) Is the restriction of adult bookstores and adult motion picture theaters to certain locations severable from any unconstitutional provisions of the ordinance;

(2) Do appellants lack standing to pursue a facial challenge to the general requirement of art. 28, § 1–128(a) that businesses obtain a zoning certificate of use;

(3) Does that general requirement constitute an unconstitutional prior restraint on protected speech; and

(4) Does the classification of adult bookstores and adult motion picture theaters as conditional uses in the C4 and W3 zones, coupled with the conditions attached, constitute an unconstitutional prior restraint on protected speech?

We think that all of the issues, raised by appellants and the county, are before us, and we shall decide them all. For reasons later explained, we need to address and resolve the validity of the licensing provisions despite the county's belated concession. We shall conclude that they are invalid. That leaves the remaining issues of whether the other provisions (1) are valid and, (2) if valid, can be severed from the licensing provisions and thus be saved. The county does not contest appellants' standing to challenge the locational requirements, but, as noted, it does oppose their standing to mount a facial challenge to the general zoning certificate of use requirement of § 1–128(a).

## III.  *DISCUSSION*

### A.  **The Applicable Standards**

Although there are many cases discussing and delineating the standards and conditions under which protected speech

may be regulated, we need focus on just a few, for they provide the guidance we need.

We start with *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). At issue there was a Detroit ordinance defining certain "regulated uses" and precluding the location of an "adult theater," which was also a defined term, within 1,000 feet of a regulated use or within 500 feet of a residential area. The intent of the ordinance was to disperse those kinds of theaters rather than have them congregated in various neighborhoods. The ordinance was challenged on a number of grounds, including the assertion that it imposed a prior restraint on protected speech.

In a 5–4 decision, the Court sustained the ordinance.[3] The Court noted that the ordinance did not limit the total number of adult theaters or deny such theaters access to the market but simply required that adult films be shown only in licensed theaters and imposed locational requirements on adult theaters that were not applicable to other theaters. Neither of those restrictions, it held, were invalid. In the First Amendment context, the Court declared that "[t]he mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing require-

---

**3.** Justice Stevens wrote an opinion consisting of three parts. We are concerned here only with Parts II and III. Part II, dealing with the First Amendment issue of whether zoning and licensing restrictions could be placed on protected speech, was concurred in by five Justices, although Justice Powell wrote separately on that issue. Justice Powell did not concur in Part III, in which Justice Stevens examined the separate treatment of adult theaters in an equal protection context. Justice Powell did not agree that nonobscene erotic material could be treated differently under First Amendment principles from other forms of protected expression but did not believe it necessary to reach that issue. He would have sustained the ordinance under the four-part test set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), *i.e.,* a regulation is valid, despite its incidental impact on First Amendment interests, if (1) it is within the constitutional power of the government, (2) it furthers an important governmental interest, (3) that interest is unrelated to the suppression of free expression, and (4) the incidental restriction is no greater than is necessary to further that interest.

ments is not a sufficient reason for invalidating these ordinances" and that "the 1,000–foot restriction does not, in itself, create an impermissible restraint on protected communication." *Id.* at 62, 96 S.Ct. at 2448.

The distinction drawn between adult and other theaters was examined in Justice Stevens's plurality opinion in a Fourteenth Amendment equal protection context, but, whether in that context or, as Justice Powell urged in his concurring opinion, in a purely First Amendment context, the Court found no violation. Although the communication of sexually explicit material may not be entirely suppressed, the plurality concluded that (1) the content of that material may be used as the basis for placing it in a different classification from other motion pictures, and (2) the particular regulation—disallowing the aggregation of such uses within neighborhoods—was permissible. In the latter regard, the Court stated, at 71, 96 S.Ct. at 2453:

"It is not our function to appraise the wisdom of [the City's] decision to require adult theaters to be separated rather than concentrated in the same areas. In either event, the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect."

Ten years later, in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, *reh'g denied,* 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986), the Court revisited the use of zoning laws to regulate adult theaters. The City of Renton had enacted an ordinance defining adult motion picture theaters and prohibiting their location within 1,000 feet of any residential zone, single or multi-family dwelling, church, park, or school. There were no such theaters in Renton at the time it passed the ordinance. Rather, enactment of the law was based on experiences in other cities and was regarded as prophylactic in nature—to avoid the perceived deleterious effects from the placement of such theaters in proximity to the enumerated uses.

The Court examined the ordinance as a time, place, and manner regulation which, though obviously treating adult the-

aters differently than other theaters and therefore not entirely content-neutral, was nonetheless aimed not at the content of any particular films but at the secondary effects of adult theaters on the surrounding neighborhoods. The appropriate inquiry, the Court said, was whether the ordinance was "designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." *Id.* at 50, 106 S.Ct. at 930. Both of those tests were held to be satisfied. The effort to preserve the quality of urban life was an important governmental interest, which, whether implemented by an attempt to disperse or to congregate purveyors of sexual excitement, was entitled to judicial respect.

As to the alternative means of communication, the Court noted that the ordinance left some 520 acres of land—about 5% of the area of the city—open to use for adult theaters. It then addressed and rejected the complaint that some of that land was already occupied by existing businesses, that practically none of the undeveloped land was currently for sale or lease, and that "in general there are no 'commercially viable' adult theater sites within the 520 acres left open by the Renton ordinance." *Id.* at 53, 106 S.Ct. at 932. The Court observed "[t]hat respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." *Id.* at 54, 106 S.Ct. at 932. Although the Court had, in the past, cautioned against the enactment of zoning regulations that have the effect of suppressing or greatly restricting access to lawful speech, it noted that it had "never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices." *Id.* The essence of the Court's holding was stated in the concluding paragraph of the opinion, at 54–55, 106 S.Ct. at 932:

"In sum, we find that the Renton ordinance represents a valid governmental response to the 'admittedly serious problems' created by adult theaters.... Renton has not used 'the power to zone as a pretext for suppressing expres-

sion' ... but rather has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zoning."

*Young* and *Renton* involved attempts to control the pernicious secondary effects of sexually oriented businesses through reasonable zoning regulations. In *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Court had before it a more comprehensive scheme of regulation, involving a combination of zoning, licensing, and inspections, although it addressed only the licensing and inspection provisions. In particular, its inquiry was limited to whether the licensing provisions of the Dallas ordinance amounted to an unconstitutional prior restraint that failed to provide adequate procedural safeguards required by *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

*Freedman* involved a challenge to the then-existing Maryland law prohibiting the sale, lease, or exhibition of motion picture films that had not been approved and licensed by the State Board of Censors. That law obviously operated as a prior restraint on protected speech, and the Court held that it could pass Constitutional muster only if it was accompanied by procedural safeguards designed to obviate the dangers of a censorship system. Three necessary safeguards were identified: (1) the burden of proving that the film constituted an *unprotected* expression had to rest with the censor; (2) there had to be judicial review of a decision to censor and the period of restraint imposed in advance of a final judicial determination had to be limited to preserving the status quo for the shortest fixed period compatible with sound judicial resolution; and (3) the procedure must "assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.* at 59, 85 S.Ct. at 739.

The full text of the Dallas licensing scheme was not set forth in any of the five opinions filed in *FW/PBS*.[4] It appears that certain defined "sexually oriented businesses," including adult arcades, adult bookstores and video stores, adult cabarets, adult motels, adult theaters and motion picture theaters, escort agencies, nude model studios, and "sexual encounter centers" required a license either issued or approved for issuance by the chief of police. Persons who had been recently convicted of any of certain enumerated crimes, or whose spouse had been recently convicted of any of those crimes, or who resided with a person who had been denied a license or had a license revoked within the past 12 months were declared ineligible for a license.

Although the ordinance required the police chief to approve the issuance of a license within 30 days after receipt of an application, it also stated that a license could not be issued to a sexually oriented business unless the business had been approved by the health department, fire department, and building official as being in compliance with applicable laws, and no

---

**4.** The principal opinion was authored by Justice O'Connor. It was in four main parts. Part I did little more than set forth the procedural history of the case. Part II discussed the standards for allowing a facial challenge and permitted such a challenge to the licensing provisions of the ordinance; it also discussed the *Freedman* standards and applied the first two of them, but not the third, to the procedural requirements for obtaining a license. Parts III and IV dealt with challenges to other parts of the ordinance not pertinent to this case—the disqualification provisions (Part III) and the regulation of adult motels (Part IV).

Part I was joined in by the Chief Justice and Justices White, Stevens, Scalia, and Kennedy and thus constituted an opinion for the Court. Part II was joined in only by Justices Stevens and Kennedy. Justices Brennan, Marshall, and Blackmun, however, in a separate opinion by Justice Brennan, concurred in the judgment invalidating the licensing provisions of the ordinance because "the licensing scheme does not provide the procedural safeguards required under our previous cases." 493 *U.S.* at 238, 110 S.Ct. at 611. They disagreed with Justice O'Connor's conclusion that the third of the *Freedman* standards—that the burden was on the censor to obtain judicial approval of a decision to censor—was not applicable. It would appear, then, that Justice O'Connor's conclusion that the licensing scheme was invalid because it failed to satisfy the first two *Freedman* standards did constitute the view of at least five Justices.

time limit was set for those approvals. Unlike the situation with respect to other businesses, the law required that sexually oriented businesses be inspected whenever there was a change in ownership and when the business applied for an annual renewal of its license, and no time limit was set for those inspections. Nor, according to the Court, did the ordinance provide for prompt judicial review of administrative decisions.

The record revealed that none of the individuals challenging the ordinance would have been disqualified from receiving a license by virtue of their own criminal background, that of their spouses, or because of their choice of housemates. They raised a facial challenge to the licensing scheme. The Court noted that facial challenges to legislation are permitted in a First Amendment context "where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad" and that, under *Freedman*, the failure to place time limitations on this kind of administrative decision-making "is a species of unbridled discretion." *Id.* at 223, 110 S.Ct. at 603. Upon that analysis, the Court allowed the facial challenge.

Those two deficiencies—the placing of unbridled discretion in the hands of administrative officials and the failure to place limits on the time within which the decisionmaker must issue a license—were also regarded as having substantive significance, as they constituted an impermissible prior restraint when applied to protected speech. Because the Dallas ordinance failed to place any limits on the time within which the city would inspect the business and thereby make it eligible for the license, it allowed "indefinite postponement of the issuance of a license." *Id.* at 227, 110 S.Ct. at 606. That deficiency, coupled with the lack of "an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial" rendered the licensing requirement unconstitutional insofar as it applied to businesses engaged in First Amendment activity. *Id.* at 229, 110 S.Ct. at

606.[5]

The standards enunciated in these cases, in both the zoning and licensing contexts, were applied in the two Fourth Circuit cases. *11126 Baltimore, supra,* 58 F.3d 988, involved a challenge to provisions of the Prince George's County zoning ordinance that precluded adult bookstores from operating anywhere in the county except through the grant of a special exception and satisfaction of certain other requirements. The operational requirements were similar to those imposed in the Anne Arundel County law under review here—that the store darken its windows and other apertures to prevent visual access from the outside, that it prohibit access by persons under age 18, and that it not be located within 1,000 feet of residences, schools, libraries, parks, playgrounds, other recreational facilities, and churches. The conditions for obtaining a special exception were far more subjective. In deciding whether to grant such an exception, the District Council was required to consider, among other things, the nature of the site, traffic conditions, the nature of the surrounding area and the extent to which the use might impair present or future development, the probable effect of the proposed use on the peace and enjoyment of people in their homes, the "purpose and intent of this Subtitle," the most appropriate use of land and structures, the conservation of property values, and the "contribution, if any, such proposed use ... would make toward the deterioration of areas and neighborhoods."

The ordinance required the District Council to render its decision on an application within 150 days, and, although judicial review of a denial was available under State law

---

5. The Court observed that the definition of "sexually oriented businesses" included a number of endeavors that did not raise First Amendment concerns. The licensing scheme was invalidated only as to businesses engaged in protected First Amendment activity. Ultimately, the case was remanded for the lower court to determine whether, as to enterprises involved in protected activity, the licensing provisions were severable. 493 U.S. at 230, 110 S.Ct. at 607. The Court noted, however, that, on remand, the lower court could also determine which businesses otherwise subject to the licensing provisions were, in fact, engaged in First Amendment activity. *Id.* at 229, 110 S.Ct. at 606–07.

(Md.Code art. 66B, § 4.08) and Md. Rules 7–201—7–210, it was the applicant's burden to seek such review, and no specific time limit was set for a decision by the court. The Fourth Circuit Court observed that, even under special expedited procedures established by the Circuit Court for Prince George's County, it could take as long as 93 days from the filing of a petition for judicial review to complete the filing of memoranda and 10 additional days could elapse before the rendition of a decision.

The court first addressed the county's argument that the challenged ordinance was a zoning regulation, not a licensing requirement, and that it should be viewed under the standards set forth in *Renton*, rather than those applied in *FW/PBS*. That had significance in two contexts—whether a facial challenge was permissible and whether the ordinance was substantively valid.

As to the first context, the court concluded that the ordinance "bears a close enough relationship to, and engenders a sufficient risk of suppression of, protected expression to permit [an affected bookstore] to bring a facial challenge to the ordinance." 58 F.3d at 994. The ordinance focused directly on the placement of bookstores engaged in conduct protected by the First Amendment and, in the court's view, effected a prior restraint on protected speech by placing unbridled discretion in the decisionmaker without adequate procedural safeguards.

On the substantive question, the court distinguished *Renton* and found that the standards set forth in *FW/PBS* were applicable. It noted that, in *Renton*, the only limitation on the operation of an adult bookstore was that it could not be located within 1,000 feet of certain other uses; subject to that, the bookstore could operate anywhere in the city without obtaining prior consent or permission. There was no prior restraint. In contrast, the Prince George's County ordinance prohibited such stores from operating anywhere in the county absent county permission in the form of a special exception and *that*, the court held, acted as a prior restraint and

required the more extensive analysis: "otherwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decisionmaker and provide for the *Freedman* procedural safeguards." *Id.* at 995.

In applying that analysis, the court focused on two aspects of the ordinance—the 150 days allowed for a decision by the District Council and the potential for delay in obtaining judicial review of a denial of a special exception. After examining a number of other ordinances, the court concluded that 150 days for a decision by the District Council was unnecessarily long and therefore did not satisfy the requirement that a determination be made within a "reasonably brief period of time." *Id.* at 998. It went on to conclude, as well, that the effective minimum of 103 days to obtain judicial review was also too long. The court noted that a bookstore seeking a special exception could face a delay of over eight months from the date of application to judicial resolution of a denial.

*Chesapeake B & M, supra,* 58 F.3d 1005 involved an actual licensing law, enacted by Harford County. The ordinance made it unlawful to operate an adult bookstore without a license issued by the Department of Inspections, Licenses and Permits. The application form was extensive and required a great deal of personal information about the applicant, the applicant's spouse, any person owning a 10% or greater interest in the enterprise, and each prospective employee, including whether they had ever been convicted of any of 32 enumerated crimes. Within seven days after receipt of an application, the department was obliged to request an inspection of the premises by the county health department and to refer the application to any other agency that might have relevant information. All of those agencies were to report back within 30 days, and, within seven days thereafter, the Department of Inspections had to inform the applicant whether the license would be issued. A license could be denied if the bookstore failed the health inspection or if the applicant, the applicant's spouse, or

a person with whom the applicant resides was convicted of any of the 32 crimes within the preceding two years. The law took effect on July 10, 1992, and any adult bookstore then operating had 45 days within which to apply for a license.

Chesapeake was one of four adult bookstores in operation when the law took effect. Rather than apply for a license, it brought suit under 42 U.S.C. § 1983, seeking a declaratory judgment that the law was unconstitutional and injunctive relief. The U.S. District Court found the law unconstitutional because it did not ensure a reasonably prompt administrative decision and failed to preserve the status quo for existing bookstores during the application process. The county accepted that decision and amended the ordinance to take account of those deficiencies.

The appeal was taken by Chesapeake, which was aggrieved by the District Court's further conclusions that the law did not vest licensing officials with unbridled discretion to suppress speech and that it adequately provided for judicial review of licensing decisions. The appellate court allowed the appeal, noting that the District Court had indicated that the law, despite its unconstitutional aspects, could still be enforced because of the possibility that the licensing agency would, in fact, make a decision within a constitutionally reasonable time.

The Fourth Circuit Court disagreed with that analysis and determined that, in light of the unreasonable time allowed for administrative decision-making, the law could not be enforced. It went on, however, to apply the principle and holding in *11126 Baltimore, supra,* that the time allowed for judicial review was also unreasonably long.

### B. Application Of These Standards

#### (1) *The Licensing Requirements*

As noted in its brief and at oral argument, the county conceded that the licensing provisions of Bill No. 98–91, along with the art. 28, § 1–128(e) requirement of a special zoning certificate of use, were unenforceable. That concession was founded upon the Fourth Circuit decisions and presumably

was based on the county's acknowledgement that the time frames allowed for administrative and judicial decision-making were unreasonably long.

This Court is not bound, of course, by a party's concession on an issue of law, for if it were otherwise, parties, rather than the court, would be effectively empowered to interpret and declare the law. Nor does the county's concession necessarily shield appellants from further attack. A new county government might, in the future, take a different view of the law, which would still be on the books, or, as happened in *Coalition v. Annapolis Lodge,* 333 Md. 359, 635 A.2d 412 (1994), other groups might seek to enforce the challenged provisions.

For these reasons, we shall not accept the county's concession as dispositive. We shall, however, conclude, without extensive comment, that, for the reasons assigned by the Fourth Circuit Court in the aforementioned cases, the provisions conceded by the county to be unenforceable are, indeed, unenforceable. The one easily identifiable problem is that of time.

Section 2–1103(a)(7) of art. 16 requires that an applicant for a Class Y license include with the application a copy of the special zoning certificate of use required by art. 28, § 1–128(e). To obtain that certificate, the applicant must have his operation approved as a conditional use in the C4 or W3 zone. It is not clear from the county code what the process is for obtaining approval as a conditional use. There are sections dealing with the process for obtaining a rezoning, special exception, or variance, but nothing that we can find dealing with how one obtains approval for a conditional use. If the process for approval as a conditional use is the same as that required to obtain a special exception, it can be lengthy and burdensome. *See* art. 28, §§ 11–103—11–112, 12–104, and 12–105. For reasons explained later in this opinion, we shall assume that the procedure for obtaining approval as a conditional use is *not* the same as that for obtaining a special exception and that it involves little delay or no discretion.

The procedure for obtaining approval as a conditional use, however, is just the beginning and, in light of our discussion later in this opinion, not dispositive. Once that approval is obtained, a separate application for the special zoning certificate of use is required. The Office of Zoning and Planning has 30 days in which to act on a completed application. Art. 28, § 1–128(e). If the application is denied, either directly or through inaction for 30 days, the applicant may appeal to the county board of appeals, which then has 60 days in which to render a decision. Art. 3, § 3–103. If the board does not act within 60 days, the decision of the Planning and Zoning Officer is deemed affirmed. If that decision was to deny the certificate of use, the applicant must then seek judicial review in the circuit court.[6] As the Fourth Circuit Court observed in *11126 Baltimore*, the judicial process can take a minimum of 93 days just for submission of the record and briefing. Unlike the local procedure in Prince George's County, there is no mandatory time for the Circuit Court for Anne Arundel County to render a decision.

Once those procedures are exhausted and the applicant obtains the zoning certificate of use, it may file the application for a Class Y license. That starts a new process. The Director of the Department of Inspections and Permits has 30 days to act upon the application. Art. 16, § 2–1105(c). If the application is denied, directly or through inaction, the applicant may appeal to the county board of appeals, which has another 60 days within which to act. If the application is not granted within that time, the applicant may seek further

---

**6.** Under a strict *Freedman* analysis, that alone might doom the provision. As noted, in *FW/PBS*, Justice O'Connor, speaking for only three Justices, concluded that the third requirement of *Freedman*, that the censor bear the burden of obtaining judicial approval for suppression of protected expression, did not apply in this context. In *11126 Baltimore*, the Fourth Circuit Court observed that "[t]he splintered opinion of the *FW/PBS* Court leaves the continued application of the third *Freedman* factor subject to some speculation." 58 F.3d at 997 n. 12. For purposes of this appeal, it makes no difference whether the third factor is applicable, so we need not decide that issue.

judicial review, with the prospect of another 93–plus days of delay.

In the *11126 Baltimore* and *Chesapeake B & M* cases, the Fourth Circuit Court held delays of that magnitude to constitute an unreasonable prior restraint on protected speech. We agree.

### (2) *Severance*

Having concluded that the licensing provisions of Bill No. 98–91 constitute an improper prior restraint on protected speech and, for that reason, are unenforceable, the question arises whether those provisions are severable or, conversely, serve to sink the entire ordinance. That issue is necessarily before us for, although appellants' operation apparently no longer qualifies as an adult bookstore, the county believes that it does qualify as a film arcade and thus as an adult motion picture theater. In that capacity, at least, it is therefore subject to the locational and general zoning certificate of use provisions.

The county, of course, argues that the invalid provisions are severable, relying principally on the severability provision contained in art. 1, § 1–108 of the County Code. In more or less standard language, that section provides that, if any word, phrase, clause, sentence, paragraph, or section of the Code is declared invalid or unconstitutional by a court, the invalidity or unconstitutionality shall not affect any of the remaining words, phrases, clauses, sentences, paragraphs, or sections of the Code, "since the same would have been enacted without the incorporation in this Code of the invalid or unconstitutional word, phrase, clause, sentence, paragraph, or section."

Although appellants urge that the entire ordinance is unconstitutional in substance, they do not take issue with the county's position that, as a matter of statutory construction, art. 1, § 1–108 would serve to sever, and thus to save, any parts of Bill No. 98–91 that were not, for other reasons, invalid.

■ Severance is a matter of legislative intent. *Sugarloaf Citizens Assoc. v. Gudis,* 319 Md. 558, 573–74, 573 A.2d 1325 (1990). There is a strong common law presumption that legislative bodies generally intend invalid enactments to be severed, if possible, and, although statutory enactments such as § 1–108 are ordinarily regarded as merely declaratory of the common law principle, they may, in doubtful cases, support a factual inference of a legislative intent to sever unenforceable provisions.

■ That inference is strengthened by the nature and purpose of the actual ordinance under consideration. It is evident from the county council's preliminary declaration that its intent was to ameliorate the harmful secondary effects that sexually oriented businesses have on neighborhoods. It chose to achieve that objective in two ways—by limiting where those kinds of businesses could be located and, through a licensing scheme, by controlling their actual operation. We hardly think it reasonable to suppose that the county council would have desired to see its underlying intent entirely frustrated simply because one of the two forms of regulation proved unenforceable. The intent to limit the location of these operations to heavy commercial and industrial areas and keep them out of areas more likely to be frequented by children and the general population is not dependent on or significantly intertwined with the intent to license them, and it can therefore easily stand on its own. We hold that the Class Y license provisions and the special zoning certificate of use requirement of art. 28, § 1–128(e) are severable.

### (3) *Locational Requirements*

■ Our focus is now limited to the remaining zoning requirements—restricting adult bookstores and adult motion picture theaters to the C4 and W3 zones as conditional uses and applying the general requirement of a zoning certificate of use, as set forth in § 1–128(a). We shall begin with the locational requirements.

We think it is clear, under *Young* and *Renton,* even with the gloss of *FW/PBS,* that the limitation of adult bookstores and adult motion picture theaters as conditional uses in the C4 and W3 zones constitutes a time, place, and manner restriction and is to be examined in accordance with the standards applicable to that kind of restriction. We think it equally clear, under those cases, that the restriction of those operations to the C4 and W3 zones serves an important governmental interest—one that was articulated by the county council in the preamble to the ordinance. *See also 5297 Pulaski Hwy. v. Town of Perryville,* 69 Md.App. 590, 519 A.2d 206 (1987) and *Landover Books v. P.G. County,* 81 Md.App. 54, 566 A.2d 792 (1989). The questions, then, are whether, under a *Renton* analysis, the ordinance allows for reasonable alternative means of communication, and, under an *FW/PBS* analysis, it leaves unbridled discretion to suppress protected expression in the hands of administrative officials.

On the record before us, the answer to the first question is clear and affirmative. The county presented uncontradicted evidence before the circuit court that there were 81 sites in the county, comprising some 2,300 acres (just under 1% of the total land in the county), on which adult bookstores or adult motion picture theaters could lawfully be located. All but one of the sites had road access; two had existing sewer service; 58 had planned sewer service; 21 had existing water service; 60 had planned water service; 37 were improved with buildings; the rest were either unimproved or improved with other structures. Although appellants now complain about the lack of utility service and posit that some sites may be inconvenient for other reasons, they offered no evidence with respect to the characteristics of those sites, to show that they could not be used or adapted for use as adult bookstores or adult motion picture theaters.

The *Renton* Court, as noted, rejected the argument that the government was obliged to ensure that speech-related businesses be able to obtain sites at bargain prices. The Federal circuit courts have since wrestled with finding an appropriate standard by which to judge when sufficient sites exist to

satisfy the reasonable alternative avenues of communication standard. The Fifth Circuit Court has adopted the view that alternative sites need not be "commercially viable," but simply that their physical and legal characteristics not make it "impossible for any adult business to locate there." *Woodall v. City of El Paso*, 950 F.2d 255, 263 (5th Cir.), *modified*, 959 F.2d 1305 (5th Cir.), *cert. denied*, 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Lakeland Lounge v. City of Jackson, Miss.*, 973 F.2d 1255 (5th Cir.), *reh'g denied*, 979 F.2d 211 (1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993). The Ninth Circuit Court has adopted a somewhat more flexible standard, of whether the alternative sites are within the "relevant real estate market," thus excluding from consideration, in the court's view, sites comprising "swamps," "warehouses," and "sewage treatment plants." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1531 (9th Cir.1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994).

We need not weigh in with our own view in this case, for, as we have observed, there is no evidence to indicate that any of the 81 sites identified by the county should be excluded from consideration under any recognized test. Appellants had an opportunity to challenge the county's exhibit. It was presented to the court under affidavit dated January, 1995, and was mentioned in the county's memorandum filed in support of its motion for summary judgment in April, 1995 and in its memorandum filed in opposition to appellants' motion for summary judgment in May, 1995.

For these reasons, we are not persuaded that alternative avenues of communication do not exist.

We turn, then, to whether the ordinance places unbridled discretion in the hands of administrative officials to suppress protected expression. Under *FW/PBS*, this is an appropriate inquiry. *11126 Baltimore, supra*, 58 F.3d 988.

In our discussion of the licensing provisions earlier in this opinion, we observed that it is not clear to us what the actual process is for obtaining approval as a conditional use. There

are extensive provisions relating to the procedure for obtaining a special exception, but the zoning law is silent with respect to conditional use approval. Although "conditional use" and "special exception" have been regarded, in zoning parlance, as more or less synonymous terms, *Rockville Fuel v. Bd. of Appeals*, 257 Md. 183, 187–88, 262 A.2d 499 (1970); *Hofmeister v. Frank Realty Co.*, 35 Md.App. 691, 698, 373 A.2d 273 (1977), the county informs us in its brief that that is not the case here. It avers that, under the Anne Arundel County law, conditional uses "do not require discretionary approval of a Board of Zoning Appeals or its equivalent" but, instead, they are treated "in the same manner as a 'permitted use,' with the exception that certain well-defined, objective conditions are imposed on the use *in addition to* any general conditions which are imposed on all uses in the zoning district." Appellee's Brief at 20, 21–22. Appellants do not challenge that assertion, and, as we have no reason to doubt it, we shall accept it as correct.

The five conditions themselves would seem to allow for little or no administrative discretion. It is easy enough to measure whether a site is within 1,000 feet of any of the enumerated uses, to determine whether the facility's windows, doors, and other apertures are sufficiently darkened to prevent visual access from the outside, and to ascertain whether the required off-street parking is available. The conditions that access be denied to persons under 18 and that the theater not be used to display obscene films or performances appear to be on-going rather than *a priori* ones, but nonetheless ones that involve no administrative discretion. We therefore find no facial invalidity to the locational requirements or conditions.[7]

---

7. As we observed in Part I of this opinion, in its action for declaratory and injunctive relief (No. 462), ARL asserted that none of the materials offered for sale at its store contained descriptions or depictions of sadomasochistic abuse or sexual conduct or excitement. That question does not appear to have been addressed by the court, or by anyone else, but it also has not been raised as an issue in this appeal. To the extent the assertion applies to those items that otherwise might cause the operation to be an adult bookstore, it is moot, for, as noted, the county has conceded that the operation does not constitute an adult bookstore

■ That leaves, finally, the question of the zoning certificate of use required by § 1–128(a). As noted, that is a general requirement for all uses other than single-family residences, and, as the county avers, there appears to be no discretion to deny one. Insofar as we can determine, the certificate simply serves the purpose of assuring that the facility is in conformance with the zoning law. If the applicant's use is authorized by the zoning ordinance—if the facility is in a C4 or W3 zone and the five objective conditions are satisfied—the certificate must be granted. Unlike what may have been the case with the special zoning certificate of use required by § 1–128(e), the issuance of this general certificate appears to be, as the county states, a ministerial act.

## IV. *CONCLUSION*

The injunction entered by the circuit court directed that appellants cease use and operation of the adult film arcade on the premises located at 1656 Annapolis Road. The court appeared to base the injunction on its finding, which was not in substantial dispute, that appellants were operating the arcade without the benefit of a Class Y license. We have concluded that the licensing requirements are unenforceable and that appellants therefore do not need such a license. The county has conceded that appellants' operation no longer qualifies as an adult bookstore and that, accordingly, those aspects of their business devoted to the sale of books, magazines, videos, and other such material are not in violation of any zoning law.

---

for other reasons. To the extent that the assertion was intended to apply to the materials displayed in the video machines, which would cause the business not to qualify as an adult film arcade, our ruling in this case is not intended to preclude appellants from further litigating that issue in an appropriate forum. Although it was raised in their complaint, it does not appear from what is before us that any evidence was presented with regard to it, and no findings were made by the court. On this record, we are not prepared to determine whether that issue was a proper one for declaratory judgment.

The fact remains, however, that the county was also seeking to enjoin appellants' operation of an enterprise that qualified as an adult film arcade, and thus as an adult motion picture theater, because it was in violation of the zoning law, and, although they do not require a Class Y license, they must comply with the zoning law. In its opinion, the court sustained the validity of that zoning law and rejected appellants' challenge to its enforceability. The facility is not located in a C4 or W3 zone and, for *that* reason, was operating unlawfully. The injunction was therefore properly granted. Appellants were operating an adult film arcade in clear violation of the zoning law, and, on this record, the county was entitled to an injunction to restrain that unlawful use. We shall affirm it.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.